A06A1166. DALEY et al. v. CLARK et al.
(638 SE2d 376)

MIKELL, Judge.

Christopher Daniel Daley ("Chris"), then a high school student, was punched in the back of the head during an after-school altercation on M. Stringer Road. Chris suffered sudden cardiac arrest, apparently due in part to a latent, undisclosed heart condition. Students called 911, summoned a nearby Hall County sheriff's deputy, and administered cardiopulmonary resuscitation (CPR). Ultimately, emergency medical technicians (EMTs) and paramedics were able to restore Chris's breathing and pulse, but he suffered a brain injury which has left him neurologically impaired. Chris's parents, Dan Daley and Tami Daley, individually and as Chris's guardians, sued law enforcement officers who responded to the scene, including Hall County Sheriff's Deputies Edward Clark, Matthew Earl Gaudio, and Shawn Douglas Jackson (the "Hall County defendants"), and City of Oakwood Police Chief Randall Moon and Sergeant Thomas L. Wilson (the "Oakwood defendants"), alleging that they arrived prior to the EMTs, hindered the students' efforts to perform CPR, refused the students' pleas to assist Chris, and failed to exercise a ministerial duty to render emergency aid to Chris. The trial court granted

[21] Id. at 256-257.

summary judgment to all of the defendants on three grounds. The court held that pursuant to the public duty doctrine, the defendants owed Chris no legal duty. Alternatively, the court held that the defendants were protected by official immunity and statutory immunity.[1] Although we deem the public duty doctrine inapplicable, we affirm on the ground that the defendants are entitled to official immunity for their discretionary actions.

1. The Daleys argue that the trial court erred in holding that the defendants owed no legal duty to Chris pursuant to the public duty doctrine. We agree.

The public duty doctrine, adopted by the Supreme Court in *City of Rome v. Jordan*,[2] provides that a municipality may not be held liable for the failure to provide police protection to individual citizens, except where a special relationship exists between the victim and the municipality.[3] As noted in *Jordan*, this emanated from the concept that

> a person does not have a duty to control the conduct of a potential tortfeasor, so as to prevent that person from harming a third person, unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the tortfeasor's conduct, or (b) a special relation exists between the actor and the tortfeasor which gives to the third person a right to protection.[4]

Subsequently, in *Hamilton v. Cannon*,[5] the Court limited the application of the public duty doctrine to the "police protection" context.[6] In *Hamilton*, the Court held that a deputy sheriff who interfered with ongoing efforts at resuscitation upon answering an emergency call to a swimming pool where a patron had collapsed could not assert the doctrine to claim that he did not owe a duty to the patron.[7] A few years later the Court broadened the application of the doctrine to "other protective police services," including "hazardous conditions caused by nature," so that a sheriff who decided not to erect

---

[1] See OCGA § 35-1-7: "A law enforcement officer shall not be liable at law for any action or actions done while performing any duty at the scene of an emergency except for gross negligence, willful or wanton misconduct, or malfeasance."

[2] 263 Ga. 26 (426 SE2d 861) (1993).

[3] Id. at 27-28 (1).

[4] (Citation and punctuation omitted.) Id. at 28, n. 3.

[5] 267 Ga. 655 (482 SE2d 370) (1997).

[6] See also *Dept. of Transp. v. Brown*, 267 Ga. 6, 8-9 (3) (471 SE2d 849) (1996) (limiting application of *Jordan* to the provision of police services).

[7] *Hamilton*, supra at 656 (1).

a barricade to a road washed out by a torrential rainstorm was immune from liability for damages sustained by motorists whose cars were wrecked.[8]

In the case at bar, the doctrine does not apply because the Daleys do not allege that the defendants had any duty to control the conduct of the tortfeasor, i.e., the student who battered Chris. The Daleys' action is based upon the defendants' alleged failure to render aid to Chris or hindrance of others who were providing aid once the defendants arrived upon the scene, in violation of their own policies. It follows that the trial court erred in granting summary judgment on this ground.[9] Nevertheless, "[a] summary judgment right for any reason will be affirmed,"[10] and the court properly held that the defendants were entitled to official immunity.

2. "The 1991 amendment to the Georgia Constitution provides that [s]tate officers and employees 'may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.' "[11] Thus, under the doctrine of official immunity, law enforcement officers may be personally liable for negligent actions taken in the performance of ministerial functions, but are immune from personal liability for discretionary actions taken within the scope of their official authority and performed without wilfulness, malice, or corruption.[12] A discretionary act is one calling for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.[13] On the other hand, "[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty."[14]

---

[8] *Rowe v. Coffey*, 270 Ga. 715, 716 (515 SE2d 375) (1999).

[9] But see *Hamilton*, supra at 661 (4) (Fletcher, P. J., dissenting) ("police officers who engage in the rescue of an injured person have a special duty not to make that person's situation worse or affirmatively increase the harm associated with that person's circumstances") (footnote omitted).

[10] (Citation omitted.) *Standard v. Hobbs*, 263 Ga. App. 873, 880 (3) (589 SE2d 634) (2003).

[11] *Adams v. Hazelwood*, 271 Ga. 414 (1) (520 SE2d 896) (1999), citing Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d) (public officers "may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions").

[12] *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001); *Gilbert v. Richardson*, 264 Ga. 744, 752 (6) (452 SE2d 476) (1994).

[13] *Standard*, supra at 875 (1) (acts of sheriff's deputy during high-speed chase were discretionary).

[14] (Citation omitted.) Id.

Stated succinctly, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.[15]

In the case at bar, the Daleys allege that all defendants violated a ministerial duty owed to Chris by failing to perform CPR on him and/or hindering students' efforts to perform CPR. They contend that this duty derives from policies and procedures established by both departments. In this regard, Hall County policy states: "1. Officers are responsible for securing the crime or incident scene to protect lives and ensure safety. 2. Officers shall render emergency aid to individuals who have suffered physical injuries, and shall, as soon as possible, summon any necessary medical assistance." The Oakwood Police Department operations manual provides: "The first to arrive at the scene of a crime or other police incident is responsible for the following actions as they may apply to the situation: A. Covering the most likely avenue of escape. B. If there are injuries involved, administering first aid and summoning medical assistance as needed."

"[A]nalysis of a public official's acts as ministerial or discretionary is dependent upon the facts of the individual case, particularly such fact or facts as specifically relevant to the official act or omission from which liability arises."[16] "The question whether a duty is ministerial or discretionary turns on the character of the specific act, not the general nature of the official's position."[17] Whether a law enforcement officer is entitled to official immunity is a question of law for the court to decide.[18] Here, the trial court determined that the defendants' actions were discretionary and that the record contained no evidence of wilfulness, malice, or corruption.

Because our analysis is dependent upon the facts, we begin with a review of the depositions and other evidence of record, bearing in mind that this is an appeal from a grant of summary judgment.

To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine

---

[15] *Reed v. DeKalb County*, 264 Ga. App. 83, 86 (589 SE2d 584) (2003), citing *Cameron*, supra.

[16] (Citation omitted.) *Meagher v. Quick*, 264 Ga. App. 639, 642 (1) (594 SE2d 182) (2003) (police officers were not entitled to official immunity from a wrongful death action based on their failure to complete a Family Violence Report, as required by OCGA § 17-4-20.1 (c), after responding to a complaint of child abuse).

[17] (Citation omitted.) *Vertner v. Gerber*, 198 Ga. App. 645, 646 (402 SE2d 315) (1991).

[18] *Conley v. Dawson*, 257 Ga. App. 665, 668 (2) (572 SE2d 34) (2002).

issue of material fact and that the undisputed facts, viewed in the light most favorable to the non-moving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case. Our review of an appeal from summary judgment is de novo.[19]

We cannot resolve the facts on motion for summary judgment, however.[20]

Viewed most favorably to the Daleys, the evidence shows that on February 14, 2000, a group of 15-25 high school students gathered to watch a fight between Chris and A. M.[21] on M. Stringer Road, a dirt road near the school. One of those students, Hebreth G. Miranda, deposed that at first, Chris and A. M. were "just grappling with each other." Then Miranda heard something loud, like a hard knock on wood. A. M. "stepped back a little bit and then punched Chris in the back of the head. And that's when Chris just fell forward on the ground and stopped moving." A. M. hit Chris again as he was falling down, "but the first hit was . . . the loudest one." Miranda went after A. M., but he was able to escape in his friend's car.

Miranda, who was the only person on the scene certified to perform CPR, ran back to Chris, started doing breathing and chest compressions, and instructed fellow student Nancy Nicole "Nicky" Wright on how to help. Miranda deposed that he kept giving Chris air, then checking his pulse. Initially, Chris had a faint pulse, but soon his heart stopped beating. Then Chris's lips started turning purple. When Miranda could not detect a pulse, he asked Wright to hold Chris's neck and started giving chest compressions. While giving Chris air, Miranda looked up and saw a deputy walking toward him. Miranda then testified,

> I screamed to him to help me, and he basically just . . . ignored me. And he walked right behind me, and all I could hear was him screaming for everybody to get away, get back. And Nicky Wright started screaming at him, please help us. She was crying. And I remember him grabbing her and pulling her away. And somehow she got loose because she

---

[19] (Citations and punctuation omitted; emphasis in original.) *Minor v. Barwick*, 264 Ga. App. 327, 328 (590 SE2d 754) (2004).

[20] *Currid v. DeKalb State Court Probation Dept.*, 274 Ga. App. 704, 709 (2) (a) (618 SE2d 621) (2005).

[21] We refer to this student by his initials because he was prosecuted as a juvenile.

came back and started helping me hold his head while I did chest compressions and gave him air. And I kept doing that and checking his pulse, but he didn't have a pulse. And then the next time I looked up, . . . there was a fire truck there and somebody was pulling me away and was telling me they were taking over.

Miranda repeatedly testified that he stayed with Chris doing CPR until the fire truck arrived. At least some of the firefighters were EMTs. He also testified that none of the law enforcement officers tried to pull him away from Chris's side. Despite his heroic efforts, Miranda could not restore Chris's breathing or pulse.

Wright recalled the events of that day differently. She deposed that when law enforcement arrived, either an officer or a deputy pulled both her and Miranda away from Chris. According to Wright, the officers stated that she and Miranda needed to get away from Chris because they "were going to end up causing him more harm by smothering him" and "were going to hurt him." Wright deposed that Miranda was not allowed to continue performing CPR on Chris.

Another student, Ashley Montblanc, deposed she arrived after the fight was over and that neither Miranda nor Wright was performing chest compressions on Chris. At some point, Montblanc saw two Hall County deputies arrive and check Chris's pulse. According to Montblanc, one deputy said he was not getting a pulse, and Montblanc begged the deputies to perform CPR. Montblanc deposed that the deputy told her to "shut up." She testified that no one was performing CPR on Chris at that point.

The first law enforcement officer to arrive at the scene was Hall County Sheriff's Deputy Edward Clark. Clark deposed that he was in the midst of investigating an accident two or three tenths of a mile away when someone drove up and reported that there was a "man down, they may have killed him." Hall County records show that Clark left for the scene at 15:46:35, advised dispatch that he needed backup, and arrived between 15:46:57 and 15:47:22.[22] Clark immediately requested that EMTs be dispatched as soon as possible. Clark deposed that although he started walking toward Chris twice, he was tied to his radio giving directions to the scene. There was evidence that the students frequently selected this location for a fight because the police had difficulty locating it. In any event, Clark testified that

---

[22] The Daleys dispute these records with others they contend show the delay was longer, but the length of the delay is irrelevant to the decisive issue – whether the defendants' actions were ministerial or discretionary.

he did not have the proper equipment to perform CPR; his certification had expired; he did not recall how many compressions to give; and another person was administering CPR to Chris at that time. Records show that the EMTs arrived on the scene at 15:50:54, three to four minutes after Clark.

Deputy Matthew Gaudio responded to Clark's radio call for assistance. Gaudio deposed that when he arrived Chris was blue; he had no pulse and was not breathing. Gaudio did not recall students asking for help; he recalled someone saying that Chris had been killed. Gaudio thought that he was dealing with a homicide. Gaudio also stated that he did not perform CPR because, given the circumstances, it did not follow from his training, which required him to ensure the safety of himself and others and to protect the integrity of the crime scene. Moreover, it did not occur to Gaudio to perform CPR because he knew that medical personnel were on the way. He testified that he moved patrol cars out of the way so that the EMTs' vehicle could get close to Chris. Gaudio also testified that although he had received CPR training in 1996 as part of POST[23] certification, he had never performed CPR, and he did not know whether CPR would have been beneficial because he did not know what had caused Chris's injuries.

Shawn Jackson was the third deputy on the scene. When he arrived, Gaudio informed him that Chris had been hit with a baseball bat, so Jackson began to scan the crowd for weapons. There was evidence that A. M.'s friend had had a baseball bat there. Gaudio also advised Jackson that Chris was not breathing and had no pulse. Jackson then called 911 on his cell phone because the radio airways were jammed and requested a crime scene unit and a medical unit, advising that there was a possible death. Records show that the EMTs arrived while Jackson was calling for assistance.

Oakwood Police Chief Moon deposed that upon his arrival, fire department personnel already were working on Chris, and Miranda was kneeling by his side. The deposition testimony mirrors Moon's report, submitted on the day after the incident, as follows: "I responded to a fight in progress call. . . . Upon my arrival one juvenile was found to be laying motionless on the ground and was being attended to by a Hall County Fire Personnel and another juvenile." Another student, Jeff Miller, submitted an affidavit stating that he did not see Moon until after the paramedics arrived. In her deposition, Wright testified that she knew "for a fact" that it was not Moon who pulled her off Chris. Wright subsequently contradicted herself in

---

[23] See OCGA § 35-8-1 et seq., the Georgia Peace Officer Standards and Training Act ("POST").

an affidavit in which she averred that Moon physically removed her from Chris's side before the EMTs arrived.[24] An EMT, Chad Bell, deposed that he remembered seeing a Hall County car and an Oakwood car when he got to the scene.

In any event, Chief Moon testified that even if he had been present before the EMTs arrived, he could not have administered CPR to Chris because his training and certification were not current at that time. Although he learned CPR during a four-hour "first responder" course at the Northeast Georgia Police Academy in 1990, Moon testified that he had never performed CPR on anyone and had received no further CPR training since 1990. In addition, Moon had been taught that a person without proper certification and training who performs CPR could do more harm than good, so the proper protocol is to call an EMT or other trained professional.

The final defendant, Oakwood Police Sergeant Thomas Wilson, testified that he followed Moon to the scene. Wilson interviewed witnesses; he testified that he did not render aid to Chris because Hall County personnel were already tending to him when he arrived. Wilson testified that he would not have known how to perform CPR in 2000 because the last contact he had with it was in 1993 or 1994.

Oakwood officer Christopher Jones, who was initially named as a defendant but dismissed after it was determined that he was not at the scene of the incident, was a certified EMT and had worked in that capacity for several years before joining the police department in 1999. Jones testified that while Moon was traveling to the scene, he instructed Jones to shut down M. Stringer Road to prevent ingress and egress. According to Jones, Moon was aware of his EMT training. Jones deposed, however, that standard operating procedure for an Oakwood police officer is to "call for emergency personnel, i.e., the fire department, and render what first aid you can." Jones also testified that he has never performed CPR as a police officer and was not carrying equipment in his vehicle with which to perform CPR.

All three EMTs who arrived on the scene, James Key, Chad Bell, and Lieutenant Stanley Sexton, deposed that when they first saw Chris, a boy and a girl were with him, and the girl stated that they had started CPR but it was not doing any good so they stopped. Sexton deposed that when he arrived, Miranda was cradling Chris's head in his lap, and Miranda remained there until the EMTs asked him to move.

---

[24] The self-contradictory portion of Wright's testimony may not be disregarded, however, because she is not a party to this litigation. See *Thompson v. Ezor*, 272 Ga. 849, 851 (2) (536 SE2d 749) (2000), distinguishing *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28-30 (1) (343 SE2d 680) (1986).

Key deposed that Chris had no pulse and was cyanotic. Key explained that he intubated Chris using a Combi-tube with 100 percent oxygen, and Chris began breathing again. According to Key, CPR performed without this oxygen concentration would not meet the patient's needs. Paramedics arrived after several minutes and were able to get a pulse using a defibrillator.

Sexton testified that he would not perform CPR on a stranger without equipment due to fear of infection. In this regard, Hall County sheriff's department procedures for communicable disease prevention require that "plastic mouth pieces or other authorized barrier/resuscitation devices shall be used whenever an employee performs CPR or mouth-to-mouth resuscitation." Sexton also explained that Chris could have suffered a brain injury, which could have caused pulmonary arrest, and performing CPR required immobilizing the head. In his incident report, Gaudio wrote that he attempted to remove all persons from the victim without moving his neck.

(a) *Discretionary versus ministerial duty*. Having reviewed the material facts of the case, we proceed to determine whether the defendants' duty to render aid to Chris was discretionary or ministerial. As stated above,

> [a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.[25]

According to Hall County victim assistance policy, deputy sheriffs are required to secure the crime or incident scene, render emergency aid to victims, and summon any necessary medical assistance. Oakwood policy states that "[t]he first to arrive at the scene . . . is responsible for the following actions as they may apply to the situation: . . . If there are injuries involved, administering first aid and summoning medical assistance as needed." The Daleys contend that these policies, along with the defendants' police academy training, imposed a ministerial duty to assess Chris immediately upon arrival at the scene and to commence CPR. We disagree.

---

[25] (Citation and punctuation omitted.) *Stone v. Taylor*, 233 Ga. App. 886, 888 (2) (506 SE2d 161) (1998).

As to the Hall County defendants, there is uncontradicted evidence in the record, in the form of an affidavit submitted by Hall County Chief Deputy Tony Carter, that although all law enforcement officers in Georgia receive basic CPR training, the sheriff's office has no policy or procedure that requires sheriff's deputies to perform CPR, and, at the time of this incident, that all of the Hall County defendants' certifications had expired. As to the Oakwood defendants, Chief Moon tendered an affidavit averring that neither the City of Oakwood nor the State of Georgia requires police officers either to maintain CPR certification or training or to carry equipment in their vehicles, such as masks or eye shields. Thus, as a matter of policy, the performance of CPR was "not specifically directed."[26]

The Daleys contend that the affidavit of George Kirkham provides evidence that a law enforcement officer's duty to perform CPR upon a victim is a ministerial one. Kirkham, a national expert in the field of law enforcement standards and procedures, averred that according to established national standards,

> police officers are professional rescuers or first responders, and [they] have an obligation to provide appropriate first aid including CPR to injured persons when they arrive on the scene until more advanced personnel such as EMTs arrive. . . . I have never heard of any department anywhere in the United States taking the position taken by the defendants in this case that the officers did not have a duty to do CPR, or more shockingly, that they would not do CPR.

We do not find this expert's affidavit, which addresses itself to a "national standard," probative of the duty of either a Hall County deputy or an Oakwood police officer, particularly in light of the fact that neither POST nor any policy of the defendants' respective departments requires them to maintain CPR certification or carry proper equipment in their vehicles. Any such requirement must come from the legislature or other governmental bodies which create policies for their departments.

OCGA § 17-4-20.1 (c), which requires police officers to complete a Family Violence Report whenever they investigate an incident of family violence, provides an example of legislation which imposes upon law enforcement a ministerial duty for the protection of victims. The forms for the reports are designed and provided by the Georgia Bureau of Investigation, and the statute lists 13 pieces of information that the report must contain. Based on the statute, we held in

---

[26] See *Standard*, supra; *Stone*, supra.

*Meagher v. Quick*[27] that officers were not entitled to official immunity from a wrongful death action based on their failure to complete the report after responding to a complaint of child abuse at a residence.[28] The child was beaten to death after officers left.[29] Because of the wording of the statute, we held that completing the report required "merely the execution of a specific duty."[30]

Such is not the case here. No statute, legal precedent, or departmental policy mandates the performance of CPR, however prudent it might be under the circumstances. The Daleys contend, however, that while the act of establishing a policy is discretionary, the acts of following established policies are ministerial tasks. But the cases they cite concerned the performance of relatively simple tasks specifically directed by official policy.[31] Those precedents followed the principle that "[p]rocedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite, and certain as merely to require the execution of a relatively simple, specific duty."[32] Here, the deputies and officers were confronted with a possible homicide scene in addition to a medical emergency. The manner in which they decided to assist the victim, under the circumstances, was a judgment call. The uncontradicted evidence showed that no defendant was certified at the time to perform CPR. Surely whether to perform CPR on a crime victim who has sustained a possible brain injury or whether to wait for better trained personnel calls for the exercise of personal deliberation and judgment.

We find no Georgia case to be precisely on point. The defendants cite precedents granting official immunity to law enforcement officers who allegedly injure innocent motorists by engaging in high speed vehicular pursuits.[33] But those cases stem from the proposition that

---

[27] Supra.

[28] Id. at 644 (1).

[29] Id. at 641.

[30] (Punctuation omitted.) Id. at 644 (1).

[31] See *Harvey v. Nichols*, 260 Ga. App. 187, 192-193 (1) (b) (581 SE2d 272) (2003) (detention officers had ministerial duty to follow procedures governing the surveillance of inmates); *Wanless v. Tatum*, 244 Ga. App. 882, 884 (536 SE2d 308) (2000) (employee county engineer had ministerial duty to obey county policy requiring the investigation of complaints regarding county roads); *Phillips v. Walls*, 242 Ga. App. 309, 312 (1) (a) (529 SE2d 626) (2000) (actions of road crews in carrying out directions regarding inspection and maintenance are ministerial); *Lincoln County v. Edmond*, 231 Ga. App. 871, 874 (2) (501 SE2d 38) (1998) (because county policy dictated that tree blocking county road must be removed, time and manner of doing so are ministerial acts); *Joyce v. Van Arsdale*, 196 Ga. App. 95, 96-97 (395 SE2d 275) (1990) (road superintendent's actions in erecting road barricade were ministerial where county commission directed him to erect barricade).

[32] (Footnote omitted.) *Smith v. Chatham County*, 264 Ga. App. 566, 569 (2) (591 SE2d 388) (2003).

[33] *Cameron*, supra; *Hanse v. Phillips*, 276 Ga. App. 558 (623 SE2d 746) (2005); *Standard*, supra; *Smith*, supra.

official immunity "is particularly important in the context of a high speed pursuit where police officers must make a split-second decision on whether to initiate the pursuit or continue it and the type of risks to take."[34] A Maryland Court of Appeals case addresses similar issues and facts, however, and we find it instructive.[35] In that case, a wrongful death action was brought against several parties, including a Baltimore police officer, who was called to assist a motorist in respiratory distress.[36] The officer was a trained EMT and brought a resuscitation mask with him.[37] He checked the victim and ensured that his airway was open but did not find a pulse. Baltimore police officers who arrive on the scene of a distressed patient before more specialized medical personnel arrive have a duty to start CPR.[38] Before the officer could start CPR, however, he saw the ambulance rounding the corner.[39] The paramedic who arrived assessed the victim and determined he was already dead and was not a viable candidate for resuscitation.[40] The appeals court affirmed the grant of summary judgment to the officer, holding, inter alia, that he was entitled to "public official" immunity because he "was clearly engaged in discretionary public duties when . . . he raced to the site of the medical emergency, attended briefly to [the victim], then turned the case over to more qualified personnel."[41] Thus, in the Maryland case, even the officer who was a trained EMT made a reasoned, discretionary choice to wait momentarily for better trained personnel to treat the victim. The case illustrates the discretionary nature of the decision in the instant case, particularly where none of the defendants maintained current certification, and CPR performed by a certified student had not worked.

The Daleys point out that the evidence, construed in their favor, shows that the students pleaded with at least one defendant for help and that a defendant removed at least one student from Chris's side. Indeed, Deputy Gaudio's incident report states that he attempted to remove the students. But the testimony of student Wright indicates that the defendants feared causing Chris more harm than good, and Gaudio's report permits an inference that he feared moving Chris's neck might harm him. And all three EMTs testified that Wright stated that CPR was not working. It was also undisputed that

---

[34] *Cameron,* supra at 123 (1).
[35] *McCoy v. Hatmaker,* 135 Md. App. 693 (763 A2d 1233) (2000).
[36] Id. at 700.
[37] Id.
[38] Id. at 717 (I) (B).
[39] Id. at 700.
[40] Id. at 701.
[41] Id. at 719 (I) (B).

Miranda was the only person on the scene then certified to do CPR. Several witnesses, including Miranda himself, testified that he stayed with Chris until the EMTs asked him to move. There is evidence, to the contrary, however, and we do not resolve facts on summary judgment. But nothing contradicts EMT Key's testimony that Chris needed to be intubated with pure oxygen or that his heartbeat was not restored until paramedics used a defibrillator to shock it. As in the Maryland case, whether to wait for the EMTs to do their job was a decision that called for the exercise of personal judgment. We do not review this judgment in hindsight unless malice is shown.

(b) *Malice*. To the extent that the Daleys argue a genuine issue of fact remains as to whether the defendants acted with malice, we disagree. "[I]n the context of official immunity, 'actual malice' requires a deliberate intention to do wrong, and denotes 'express malice or malice in fact.' "[42] It does not include wilful, wanton or reckless conduct or implied malice.[43] Thus, actual malice does not include "conduct exhibiting a 'reckless disregard for human life.' "[44] Here, no inference may be drawn that any defendant acted with malice. Telling a student to "shut up" does not evidence a deliberate intention to harm Chris. Even moving away persons who were trying to help does not show malice, given the undisputed testimony that they were afraid the persons might harm him and that CPR was not working in any event. Finally, the allegation that Chief Moon sent Jones, a trained EMT, away from the scene after finding Chris unresponsive is not supported by the record. Jones was not at the scene, and there is no evidence that he could have arrived in time to help Chris, given that EMTs had already been dispatched, as indicated by Deputy Jackson. It follows that the trial court did not err in granting summary judgment to the defendants on the basis of official immunity.

3. Finally, the Daleys argue that the trial court erred in granting summary judgment to the defendants on the basis of OCGA § 35-1-7, which provides: "A law enforcement officer shall not be liable at law for any action or actions done while performing any duty at the scene of an emergency except for gross negligence, willful or wanton misconduct, or malfeasance." The statute applies to sheriffs and their deputies as well.[45] The Daleys argue that under this statute, the defendants may be held liable for acts of gross negligence, wilful or

---

[42] (Citations and punctuation omitted.) *Adams*, supra at 414-415 (2). Similarly, "[w]ilful misconduct is based on an actual intention to do harm or inflict injury." (Punctuation and footnote omitted.) *Currid*, supra at 707 (2).

[43] *Hanse*, supra at 563 (2); *Conley*, supra at 668 (2), n. 11.

[44] (Citations omitted.) *Merrow v. Hawkins*, 266 Ga. 390, 392 (2) (467 SE2d 336) (1996).

[45] See OCGA § 35-1-7.

wanton misconduct, or malfeasance committed at the scene. We need not reach this issue, however, because as explained above, summary judgment for these defendants was demanded by their official immunity.

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 2, 2006 —

*Parks, Chesin & Walbert, David F. Walbert, Peter F. Boyce*, for appellants.

*Freeman, Mathis & Gary, Theodore Freeman, Carothers & Mitchell, Richard A. Carothers, Cheryl Regina Benton Reid, Stewart, Melvin & Frost, William H. Blalock, Jr., Herman, Mathis, Casey, Kitchens & Gerel, Andrea S. Hirsch*, for appellees.