A09A1855. GISH et al. v. THOMAS et al.
A09A1944. PIKE COUNTY v. GISH et al.
(691 SE2d 900)

ADAMS, Judge.
On December 9, 2005, Beverly Gish, as administratrix of the estate of her son, Jesse Brandon Gish, filed a complaint for damages asserting both federal and state law claims in the United States District Court for the Northern District of Georgia against Pike

---

County, Georgia; Jimmy Thomas, the sheriff of Pike County; and William Gilmer, a Pike County deputy sheriff. Thomas and Gilmer were sued in both their individual and official capacities. The district court granted the defendants' motion for summary judgment on the federal law claims on March 7, 2007, and dismissed all the state law claims without prejudice.

On August 21, 2007, Gish, individually and as administratrix of the estate of her son, filed a complaint for wrongful death and damages pursuant to OCGA § 9-2-61 (a) and (c) (the renewal statute). Defendants answered and then moved for summary judgment on the grounds, inter alia, that they were shielded from suit by the doctrines of sovereign and official immunity. After the trial court denied the motion in part and granted the motion in part, the parties filed their appeals to this Court. Gish's appeal has been docketed in this Court as Case No. A09A1855 and the County's cross-appeal has been docketed in this Court as Case No. A09A1944. We have consolidated these appeals for our review.

The critical facts here are essentially undisputed, and will be taken verbatim from the trial court's extensive order:[1]

> On December 10, 2003, Jesse Brandon Gish was arrested by the Pike County Sheriff's Department for simple battery (family violence) after attacking his mother and was transported to the Pike County Jail. At the Pike County Jail, it was determined that Brandon Gish was potentially suicidal and had even attempted suicide two days prior to his arrest. Pike County Jail does not have appropriate staff or medical resources to handle detainees with mental health needs, so Lt. Moorman, the Jail Administrator, decided to transfer Mr. Gish somewhere with a full-time medical staff and facilities sufficient to provide constant monitoring of Mr. Gish.
>
> Deputy William Gilmer was subsequently assigned to transport Mr. Gish to the Clayton County Jail. Deputy Gilmer transferred Mr. Gish using his regularly assigned vehicle, a marked patrol car with darkly tinted windows. The front and back seat areas of the patrol vehicle are separated by a metal and Plexiglass partition that can be bolted into place; moreover, "(s)et into the partition is a sliding Plexiglass window, which can be locked in place or opened." Deputy Gilmer never used or operated this security screen and was unfamiliar with the mechanical work-

---

[1] Citations to depositions and other documents contained in the trial court's order have been omitted.

ings of it. The patrol vehicle was covered under an insurance policy purchased by Pike County that covers money damages for liability arising from the ownership, maintenance or use of a covered vehicle.

Deputy Gilmer was aware that Mr. Gish was being transferred to Clayton County for mental health reasons, specifically that he may be suicidal or may have made suicidal threats. Deputy Gilmer handcuffed Mr. Gish with his hands behind his back, placed him in the rear of his patrol vehicle, buckled the seatbelt, got in the driver's seat, and drove Mr. Gish to the Clayton County Jail. During the drive, Mr. Gish managed to unbuckle his seatbelt and maneuver his hands, while cuffed, to the front of his body. Deputy Gilmer was unaware of this until he opened the back door to remove Mr. Gish from the vehicle.

Upon his arrival at the Jail, Deputy Gilmer placed his loaded service pistol, along with some other items, on the front seat of his patrol car because the Clayton County Sheriff's Office does not permit firearms inside the jail. Deputy Gilmer then exited the vehicle and retrieved Mr. Gish from the back to escort him inside and turn him over to the jail staff. At the Jail, Deputy Gilmer delivered a "Transfer of Custody" form containing a hand-written notation regarding Mr. Gish: "Has made suicidal statements/is bi-polar," and informed an official that Mr. Gish should be placed on suicide watch. Mr. Gish was, in fact, placed on suicide watch at the Clayton County Jail, and remained at the facility without any significant incidents for two days.

On December 12, 2003, Mr. Gish was scheduled to appear before the Pike County Magistrate Court in connection with the criminal charges against him. Deputy Gilmer was assigned to transport Mr. Gish from the Clayton County Jail to the Magistrate Court and back again. He picked up Mr. Gish, handcuffed him in front, and placed him in the back seat of the patrol car; during the drive to Pike County, Gish appeared calm and stared out the window.

After Mr. Gish's appearance at Magistrate Court, Deputy Gilmer was again assigned to drive Mr. Gish to the Clayton County Jail. Deputy Gilmer did not recall Mr. Gish saying anything and stated in his deposition that Mr. Gish appeared "calm, normal and in the same state of mind as when (Deputy) Gilmer had picked him up." Upon reaching the Clayton County Jail, Deputy Gilmer pulled through the gate and parked in the "sally port" area. He then removed

YALE LAW LIBRARY

his loaded gun, among other things, from his duty belt and placed these on the front passenger seat. A few minutes[2] after exiting the vehicle, Deputy Gilmer went to the rear door of the patrol vehicle to remove Mr. Gish. While Deputy Gilmer was outside his vehicle, Mr. Gish managed to retrieve the Deputy's gun from the front seat of the car, placed the gun in his mouth, and pulled the trigger. Upon opening the door and seeing Mr. Gish bleeding, Deputy Gilmer rushed to the jail and requested medical help. Medical personnel attempted to resuscitate Mr. Gish, but were unsuccessful and he was pronounced dead on arrival at Southern Regional Medical Center.[3]

### Case No. A09A1855

1. We turn first to the issue of whether official immunity shielded the individual defendants in this case to the extent they were sued in their personal capacities. See *Cameron v. Lang*, 274 Ga. 122, 123 (1), 126 (3) (549 SE2d 341) (2001) (the threshold issue is whether the County and the individual defendants are protected from suit by the doctrines of official and sovereign immunity).

Under the doctrine of official, or qualified, immunity, law enforcement officers may be personally liable for negligent actions taken in the performance of ministerial functions, but are immune from personal liability for discretionary acts taken within the scope of their official authority and performed without wilfulness, malice, or corruption. *Cameron*, 274 Ga. at 123 (1).

Stated succinctly, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure. The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight.

---

[2] The trial court added the following footnote:
The parties are in dispute as to how long after parking in the "sally port" area of the Jail it took Deputy Gilmer to exit his vehicle, walk around the car, and remove Mr. Gish from the vehicle. The defendants claim it took less than two minutes from the time he pulled in. The plaintiffs contend that it took fifteen minutes from the time Deputy Gilmer's vehicle was admitted "through the sally port gate" until the first call [was] placed to 911.

[3] As noted by the trial court in a footnote:
The defendants contend that Mr. Gish died immediately as a result of the self-inflicted gunshot wound because the bullet passed through the medulla and the brainstem. The plaintiff contends that Mr. Gish was still moving and breathing and experienced conscious pain and suffering before death.

(Footnote omitted.) *Daley v. Clark*, 282 Ga. App. 235, 238 (2) (638 SE2d 376) (2006).

The trial court in this case found that the act of transporting prisoners was a discretionary function, and that since there were no allegations or evidence of actual malice or an intent to injure, Gilmer and Thomas were entitled to summary judgment on the claims asserted against them in their individual capacities.[4] Gish argues, however, that Gilmer committed two negligent ministerial acts — he left his loaded weapon on the front seat of his vehicle and he handcuffed Brandon improperly. Thus, in determining the propriety of the trial court's ruling on this issue, we must determine whether Gilmer was performing a discretionary function, as the trial court found, or whether this case is more properly viewed as involving the negligent performance of two ministerial acts, as Gish urges.

We have explained the difference between ministerial and discretionary acts as follows:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty.

(Footnote omitted.) *Golden v. Vickery*, 285 Ga. App. 216, 217-218 (645 SE2d 695) (2007). And in determining

> whether an action is discretionary or ministerial, the court must focus on the character of the specific actions taken by the government official or employee, not the general nature of the job. Under this standard it makes no difference that the official is required to perform discretionary acts if the complained-of act is more properly characterized as ministerial. The grant of qualified immunity, then, is really more in the nature of a transitory privilege rooted in the fear that

---

[4] Gish contends in her brief and reply brief that in Count 2 of her complaint she asserted a claim against Thomas in his individual capacity for alleged negligent supervision of Gilmer. However, contrary to her contentions on appeal, even when read liberally, Count 2 of the complaint asserts a respondeat superior claim against Thomas based on Gilmer's alleged negligence in transporting Brandon, not a negligent supervision claim. Thus we need not consider the application of official immunity to a claim of that nature.

a contrary rule would inhibit the judgment upon which good government rests. The single overriding factor is whether the specific act from which liability allegedly arises is discretionary or ministerial. This determination is made on a case-by-case basis.

(Punctuation and footnotes omitted.) *Heller v. City of Atlanta*, 290 Ga. App. 345, 347-348 (1) (659 SE2d 617) (2008).

In *Cameron*, our Supreme Court found that initiating a high speed chase against persons suspected of car theft was a discretionary act, noting that it had "previously held that a law enforcement officer exercises discretion in responding to an emergency call, entrusting a car to a jail inmate, executing a search warrant, and firing a gun at a suspect." Id. at 125 (2) (and cites). We agree with the reasoning of the trial court that under the facts of this case, transporting prisoners was a similar discretionary act. As the trial court noted in its order,

> [w]hile the [Pike County] Sheriff's Office does provide some guidance on prisoner transport, nothing in the policies can be said to render the act of prisoner transport ministerial; Deputy Gilmer still had wide discretion in handling his job and much of the specifics of prisoner transport were left to his personal judgment. Further, it is clear that the danger inherent in prisoner transport and the judgment that must be applied to handle different transportees renders the act discretionary.

Gish argues, however, that the issue is not whether the act of transporting prisoners was discretionary or ministerial, but whether the specific acts of storing weapons in a patrol car and the handcuffing of inmates were discretionary or ministerial acts. Even assuming without deciding that those specific acts constitute the relevant inquiry here,[5] it is undisputed that at the time of Brandon's death, the Pike County Sheriff's Office did not have written departmental policies or procedures governing handcuffing inmates during transport or the securing of weapons in patrol cars. Although Gish relies on various provisions of Georgia's Peace Officer Standards and

---

[5] But see *Cameron*, 274 Ga. at 125 (2), noting that "[a]llegations . . . that the officer ran the stop sign without turning on his blue lights or his siren do not change his decision to engage in a high speed pursuit into a ministerial act, but merely raise a question of fact concerning whether he drove with due regard for the public's safety." Likewise, in this case it seems to us that whether Gilmer was negligent in the manner in which he executed the discretionary function of transporting a prisoner does not turn that function into a ministerial act.

Training Council (P.O.S.T.) training manual to establish these acts as ministerial, these provisions provide only general guidelines, and had not been explicitly adopted by the Pike County Sheriff's Office. While Gish argues that these policies were reinforced when Gilmer was training for the position with Pike County, the record shows that Gilmer was never instructed to put his gun in a certain location or to handcuff a prisoner in a certain way, even though he may have observed other officers perform these acts as Gish contends they should have been performed. Thus, the trial court properly rejected Gish's argument that there were established policies and procedures giving rise to a ministerial duty in this case, and this case is thus distinguishable from those cases involving "relatively simple tasks specifically directed by official policy." *Daley*, 282 Ga. App. at 245 (declining to find that law enforcement officers had a ministerial duty to perform CPR where there was no statute or department policy mandating the performance). See also *Golden*, 285 Ga. App. at 219-220 (listing cases finding breach of ministerial duty in failure to follow established policy or procedure and cases finding discretion to act in the absence of established guidelines). This enumeration thus affords no basis for reversal.

2. Gish argues the trial court also erred by holding that sovereign immunity barred all claims[6] against Thomas and Gilmer in their official capacities because the County's purchase of an automobile liability insurance policy resulted in a waiver of that immunity. See OCGA § 33-24-51.[7] Specifically, Gish contends that the trial court's holding that the claim did not arise out of the use of the covered automobile is at odds with numerous decisions from our appellate courts construing the term "use" in automobile insurance policies.[8] But, in contrast to those cases, where those terms may be broadly construed to effectuate coverage, our law is clear that statutes such as the one at issue here, providing for a waiver of sovereign immunity, are in derogation of the common law and thus are to be strictly construed against a finding of waiver. *Smith v. Chatham County*, 264 Ga. App. 566, 568-569 (1) (591 SE2d 388) (2003). Moreover, Gish had the burden of establishing that the County waived

---

[6] Gish does not challenge the grant of summary judgment on her claim for negligent maintenance of the vehicle, which she asserted against Thomas in his official capacity.

[7] OCGA § 33-24-51 was amended in 2002, but that amendment was not effective until 2005. The pre-2002 version of the statute is applicable here. *Williams v. Whitfield County*, 289 Ga. App. 301, 302-303 (656 SE2d 584) (2008).

[8] A sovereign immunity waiver pursuant to the applicable version of OCGA § 33-24-51 could "arise[ ] out of *either* ownership, maintenance, operation, or use" of a motor vehicle. (Emphasis supplied.) *Chamlee v. Henry County Bd. of Ed.*, 239 Ga. App. 183, 187-188 (2) (521 SE2d 78) (1999). Since it appears without dispute that the claims here did not arise from the ownership or operation of the vehicle, the question in this case is whether the claims arose from the use of the vehicle. See OCGA § 33-24-51 (a).

sovereign immunity by obtaining liability insurance protection covering her claim. Id. at 567-568 (1).

As we recently reiterated, "whether an event arises from the 'use' of a motor vehicle depends largely on the circumstances, and a bright-line definition is elusive." *Williams v. Whitfield County*, 289 Ga. App. 301, 304 (656 SE2d 584) (2008) quoting *Harry v. Glynn County*, 269 Ga. 503, 504 (1) (501 SE2d 196) (1998).

> As further held in *Saylor v. Troup County*, [225 Ga. App. 489 (484 SE2d 298) (1997),] "(t)he question to be answered is whether the injury 'originated from,' 'had its origin in,' 'grew out of,' or 'flowed from' the use of the motor vehicle *as a vehicle*." [Id. at 490 (citation and punctuation omitted; emphasis supplied.)]

*Williams*, 289 Ga. App. at 304. See also *Tittle v. Corso*, 256 Ga. App. 859, 864 (2) (569 SE2d 873) (2002).

Employing that analysis here, we agree with the trial court's finding that at the time of Brandon's suicide, Gilmer's vehicle was essentially being used as a holding cell and did not relate to the use of the patrol car *as a vehicle*. This finding is in accordance with cases such as *Williams*, 289 Ga. App. at 305 (vehicle merely present as a static physical mass); *Tittle*, 256 Ga. App. at 864 (2) (injury did not arise from use of the patrol car whose lights were used to illuminate the area and suspect placed against the hood of the car); *Saylor*, 225 Ga. App. at 490 (van was inoperative, parked on the side of the road with its engine not engaged, when plaintiff was injured); *Hicks v. Walker County School Dist.*, 172 Ga. App. 428, 429 (1) (323 SE2d 231) (1984) (no causal connection between the injury deliberately inflicted on a student on a school bus by other school children and the use of the bus as contemplated by the parties to the insurance policy).

The trial court did not err by granting summary judgment to Thomas and Gilmer on the basis of sovereign immunity.

3. Next Gish argues that the trial court erred by holding that any claim for the wrongful death of Brandon is time-barred. The record shows that Gish was not a party to the original action filed in federal court except as the representative of the estate. In the present state court case, the trial court found that the estate lacked standing to bring the wrongful death claim and that Gish's claims in her individual capacity were barred by the applicable two-year statute of limitation, reasoning that she could not benefit from the renewal statute since she, individually, was not a party to the first action.

Long-standing and well-settled precedent establishes that in a renewal action "the cause of action must be substantially the same

as in the original action [and t]here must also be a substantial identity of essential parties." (Punctuation and footnotes omitted.) *Soley v. Dodson*, 256 Ga. App. 770, 772 (569 SE2d 870) (2002). *Sheldon & Co. v. Emory Univ.*, 184 Ga. 440, 440-441 (1) (191 SE 497) (1937). *Moss v. Keesler*, 60 Ga. 44 (1878). And a person's individual and representative capacities are not substantially identical. *Sheldon*, 184 Ga. at 440-441 (1), (3); *Stiltjes v. Ridco Exterminating Co.*, 197 Ga. App. 852, 853 (399 SE2d 708) (1990) (finding that plaintiff in her individual capacity and in her capacity as administratrix are legally different persons). Because Gish, individually, was never a party to the original case filed in federal court,[9] she was not entitled to benefit from the renewal statute. The trial court did not err by finding the wrongful death claim time-barred under the circumstances of this case.

### Case No. A09A1944

4. Gish also sued Pike County for a breach of duty to provide medical care, asserting that the County's sovereign immunity for this claim had been waived by OCGA § 42-5-2. The trial court, relying on *Middlebrooks v. Bibb County*, 261 Ga. App. 382, 384 (1) (582 SE2d 539) (2003), agreed that sovereign immunity had been waived for this claim. Pike County challenges that ruling, arguing that *Middlebrooks* and like cases should be overruled. We agree that the trial court erred by finding that OCGA § 42-5-2 waives the County's sovereign immunity for claims based on failure to provide medical care, but decline to overrule those cases as more fully set forth below.

Pursuant to the Georgia Constitution, a county's governmental immunity to tort claims can only be waived by an express act of the legislature. Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e); *Currid v. DeKalb State Court Probation Dept.*, 285 Ga. 184, 186-187 (674 SE2d 894) (2009). It follows that implied waivers of sovereign immunity are not favored. Id. OCGA § 42-5-2 does not provide an express waiver and, indeed, nothing in the statute can be read to imply a waiver.

In *Howard v. City of Columbus*, 239 Ga. App. 399, 410 (2) (a) (521 SE2d 51) (1999), which is quoted in *Middlebrooks*, we specifically held that section, while imposing a duty and the cost of medical

---

[9] Gish's attempt to challenge the federal court's ruling denying her "motion to substitute" parties in her appeal to this Court must fail for a number of reasons, including the fact that she did not raise this issue in the trial court, she was not a party to the federal court actions, and we have no authority to consider a challenge to the federal court's order by a person who was not a party to that case.

care of inmates in the custody of the county upon the county, *did not* waive sovereign immunity of the county.

> While OCGA § 42-5-2 (a) imposes the duty and the cost for medical care of inmates in the custody of a county upon the county, such statute *did not waive* sovereign immunity of the county or its agents and employees. Art. I, Sec. II, Par. IX of the 1983 Georgia Constitution created constitutional sovereign immunity for the state and its political subdivisions.

Id. at 410 (2) (a). We then went on to state:

> (A) county is not liable to suit for any cause of action unless made so by statute. OCGA § 36-1-4. This includes actions brought under a theory of negligence as the plaintiffs have asserted in this case.... Thus, the City of Columbus, Muscogee County, as well as [various individual defendants sued in their official capacities] are all protected from tort action by sovereign immunity.

Id. However, in Division (2) (b) of *Howard*, we went on to discuss whether the *official* or qualified immunity of certain defendants who were sued in their individual capacities was waived. After finding that the provision of medical care is a ministerial rather than a discretionary act, we held that "such act is not subject to either sovereign immunity or official immunity." Id. at 411 (2) (b). Although this language appears to contradict the explicit holding in the immediately preceding subdivision, it is merely dicta since the issue under consideration in Division (2) (b) was whether official, not sovereign, immunity barred the claim for failure to provide medical care.[10]

*Middlebrooks*, in deciding whether the trial court had properly granted summary judgment to the County for failure to provide medical care to the deceased, somewhat confusingly quoted the language from both subdivisions (a) and (b) of Division 2 of *Howard*, first reaffirming that OCGA § 42-5-2 (a) "did not waive [the]

---

[10] Moreover, to the extent the Court stated that the provision of medical care constituted a fundamental right, we were relying on our analysis in *Cantrell v. Thurman*, 231 Ga. App. 510 (499 SE2d 416) (1998), which involved a section 1983 claim as well as state law tort claims. And *Davis v. City of Roswell*, 250 Ga. 8 (295 SE2d 317) (1982), cited in *Cantrell* involved only a section 1983 claim decided under federal law. Likewise, in *Howard*, plaintiffs had asserted federal claims as well as state law claims. This may help explain some of the resulting confusion in the analysis in *Middlebrooks* since the earlier cases involved federal law claims and the issue of whether section 1983 actions could be maintained.

sovereign immunity of the county or its agents and employees" but then continuing with the language from subdivision (2) (b) of *Howard* stating that a cause of action for failure to provide medical care "is *not* subject to either sovereign immunity or official immunity." And to add to the confusion, the Court appended a footnote to its analysis, also citing to *Howard*, stating that "while sovereign immunity is not a bar to an action brought pursuant to 42 USC § 1983 for violations of Eighth Amendment rights, plaintiffs have not asserted a § 1983 claim" seeming to indicate that we were, in fact, holding that the state law claims in *Middlebrooks* were barred by sovereign immunity. Id. at 385, n. 3. Thus, while it is unclear exactly what *Middlebrooks* held generally concerning the waiver of sovereign immunity as to a claim asserting an alleged violation of the right to medical care, it, as well as *Howard*, clearly held that OCGA § 42-5-2 does not contain such a waiver and sovereign immunity applies to bar any claims brought pursuant to that section, such as the one at issue here.[11]

Based on the foregoing, we caution the bench and bar that, properly read, the above-cited cases do not hold or provide authority for the proposition that OCGA § 42-5-2 provides for a waiver of sovereign immunity for claims brought pursuant to that section against a county for failure to provide medical care. The trial court's holding to the contrary in this case is therefore reversed.

5. In light of our holding in Division 4, we need not consider the County's remaining enumerations of error.

*Judgment affirmed in Case No. A09A1855. Judgment reversed in Case No. A09A1944. Blackburn, P. J., and Doyle, J., concur.*

DECIDED MARCH 17, 2010.

*Casey & Gilson, George P. Shingler*, for appellants.
*Jason C. Waymire*, for appellees.

---

[11] In this regard we reiterate that the present case also does not involve any federal law claims and that Gish asserted in the complaint that the "County's sovereign immunity is waived for failure to provide detainees medical care by 42-5-2" and we therefore confine ourselves to that issue.