### 76858. CITY OF EATONTON v. FEW et al.
(377 SE2d 504)

CARLEY, Judge.

This is the second appearance of this wrongful death case before this court. In *Few v. City of Eatonton,* 179 Ga. App. 110 (345 SE2d 657) (1986), we reversed the grant of summary judgment in favor of appellant-defendant City of Eatonton. Thereafter, the case was tried before a jury and a verdict in favor of appellee-plaintiffs was returned. After judgment was entered on the jury's verdict, appellant filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial. Appellant now appeals from the denial of its alternative motions and from the judgment which was entered by the trial court on the jury's verdict in favor of appellees.

1. Appellant enumerates the general grounds, urging that there was insufficient evidence to authorize a finding of its liability for the death of appellees' decedent under a nuisance theory.

In this very same case, we have previously dealt with the evidentiary requirements for proving the existence of an actionable nuisance and found that the evidence was sufficient to authorize a finding of appellant's liability under a nuisance theory. *Few v. City of Eatonton,* supra. In *Few,* we held: " 'In *City of Bowman v. Gunnells,* 243 Ga. 809 (2) (256 SE2d 782) (1979), the Supreme Court set out three guidelines to define a nuisance for which a city may be held liable. First, the defect or degree of misfeasance must be to such a degree as would exceed the concept of mere negligence. Second, the act must be of some duration. Third, the city must have failed to act within a reasonable time after knowledge of the defect or dangerous condition.' *Rainey v. City of East Point,* 173 Ga. App. 893, 894 (328 SE2d 567) [(1985)]. Applying these guidelines to the case sub judice we find evidence which would authorize a jury to conclude that the manner in which the pool was operated created a nuisance. The evidence stated

most favorably to the non-moving party shows that the water in the pool was sufficiently cloudy or dirty that one could not see the bottom of the pool at the deep end (12 feet deep). This condition existed when the pool opened for the summer and continued through the time of the death of plaintiffs' son in late June. The machine which would clean the water was broken and the city received repeated notice of that fact. An employee of the defendant City of Eatonton attempted to correct the problem without success. Also, while there was conflicting evidence as to the division of responsibilities in regard to the pool between the City of Eatonton and Putnam County, there is evidence which could authorize a conclusion that the city was responsible for the operation and maintenance of the pool." *Few v. City of Eatonton,* supra at 111.

Only in a rare case will the evidence which is adduced during the pre-trial discovery process be mirrored exactly by the evidence which is adduced during the subsequent trial. However, insofar as *sufficiency* is concerned, a review of the evidence upon which the jury in this case returned its verdict shows that it is substantially the same as that which was in the record before this Court in *Few*. Appellant's primary contention relates to the sufficiency of the evidence of its prior knowledge of the dirty or cloudy condition of the pool. While exactly the same deposition testimony of Coach Robert Woods, who was the pool manager, may not appear in the trial transcript, the following *is* in the trial transcript: Coach Woods was asked: "Do you have a recollection of how many times you attempted to contact or attempted to get Mr. [Edwin] Hodges [, appellant's employee in charge of the municipal water system,] over to the pool before [the] death [of appellees' decedent]?" Coach Woods responded: "Off the top of my head I would have to say about five times." Immediately after this testimony concerning Coach Woods' attempt to contact Mr. Hodges "about five times" the following questions and answers appear:

"Q: Did [Mr. Hodges] ever come over before [appellees' decedent] drowned and work on the pool?

"A: Yes he did.

"Q: Did the problem go away?

"A: Well, it went away and it came back. It went away and it came back. It was that type of thing.

"Q: Do you know what the problem was [Mr. Hodges] was trying to fix?

"A: Well, I don't know the anatomical words that you use. But I think it was to drain the dirty water out and to clear it out some kind of way. I'm not — I'm not really sure of the terminology that he used."

Later during the examination of Coach Woods, he was asked:

"Q: Did Mr. Hodges, before [appellees' decedent] drowned, ever get the thing straightened out to where the pool stayed clear for several days?

"A: There was one particular time I know of that he worked real, real hard on it *because I had been complaining about the cloudiness,* and he worked on it, and I guess — I guess when you add a lot of chlorine it's called shocking the pool and I think that's what he did, he shocked the pool. But, I guess it stays like that maybe one or two days and after that you saw the cloudiness coming back again." (Emphasis supplied.)

In addition to the testimony of witnesses called by the appellees, one of *appellant's* own witnesses was asked on cross-examination the following:

"Q: . . . After the pool opened, did Edwin Hodges run it or did Coach Woods?

"A: *Edwin Hodges ran it.*"

Finally, another of appellant's witnesses, on cross-examination, stated that Mr. Hodges would stop by the pool occasionally and work in the pump room. The witness stated that Mr. Hodges would usually stay about 15 to 20 minutes. Most importantly, in response to the inquiry as to why Mr. Hodges was at the pool on those occasions, the witness stated: "Trying to clear the condition."

Based upon the above portions of the record, we again "find evidence which would authorize a jury to conclude that the manner in which the pool was operated created [an actionable] nuisance. . . . The machine which would clean the water was broken and the city received repeated notice of that fact. An employee of the defendant City of Eatonton attempted to correct the problem without success." *Few v. City of Eatonton,* supra at 111. As indicated, this Court in *Few* reversed the grant of summary judgment because a jury would be *authorized* to find the existence of an actionable nuisance. Now, the jury, having heard substantially the same evidence, has found just that. The jury verdict being supported by sufficient evidence, it was not reversible error to enter judgment thereon.

2. Contending that there was no evidence to authorize a finding that it operated and maintained the swimming pool as a "joint enterprise" with Putnam County, appellant moved for a directed verdict as to that issue. The trial court denied appellant's motion and that ruling is enumerated as error.

" 'Broadly, there is a joint enterprise or adventure when two or more combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, provided the arrangement does not establish a partnership.' [Cit.]" *Bowman v. Fuller,* 84 Ga. App. 421, 425 (1) (66 SE2d 249) (1951). Appellant urges that, under the evidence, the elements of a profit motive and of mutual control

are otherwise lacking in its agreement with Putnam County as to the operation and maintenance of the pool, preventing that agreement from being found to be a "joint enterprise."

Notwithstanding appellant's reliance upon certain appellate decisions which discuss "joint enterprise" as that concept is "broadly" defined, it is clear that a "joint enterprise" may nevertheless be found to exist even though a profit motive and mutual control are otherwise lacking. See *Seckinger & Co. v. Foreman*, 252 Ga. 540, 541 (1) (314 SE2d 891) (1984). The Constitution of this state specifically authorizes a county and a municipality to enter into joint agreements. The Constitution provides that they "may contract . . . with each other . . . for *joint* services, for the provision of services, or for the *joint* or separate use of facilities or equipment. . . ." (Emphasis supplied.) Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a). Pursuant to this constitutional provision, appellant and Putnam County, in effect, entered into a "joint enterprise" whereby the swimming pool would be operated and maintained for the mutual benefit of their citizens. The evidence shows that appellant retained both the ownership of its municipal swimming pool and the responsibility for the maintenance of the pool equipment and that Putnam County assumed responsibility for the actual day-to-day operation of the pool. Thus, by combining appellant's property and the maintenance labor of its employees with the operation labor of Putnam County's employees, a swimming pool was jointly maintained and operated for the residents of the city and the county. On this evidence, a finding was authorized that the swimming pool was a "joint enterprise," regardless of the lack of a profit motive and notwithstanding the parties' determination, as between themselves, how the control over the facility would be exercised. Cf. *Seckinger & Co. v. Foreman*, supra. It follows that the trial court did not err in failing to grant appellant a directed verdict as to the "joint enterprise" issue.

3. Appellant enumerates as error the trial court's giving of several charges relating to the legal principles applicable to a "joint enterprise." Appellant's only contention is that the evidence did not authorize a finding of the existence of a "joint enterprise" and, therefore, the giving of any charge relating to that issue was not authorized. As discussed in Division 2, however, the evidence did authorize a finding that the maintenance and operation of the swimming pool was a "joint enterprise." Accordingly, the charges were not erroneously given.

4. Appellant requested a charge which was to the effect that, under the doctrine of governmental immunity, liability could not be predicated upon its alleged negligence in the operation and maintenance of the swimming pool. The failure to give this charge is enumerated as error.

Appellant's refused request is a correct statement of the law. See generally *Robinson v. City of Decatur*, 253 Ga. 779 (1) (325 SE2d 752) (1985), overruled on other grounds, *Martin v. Ga. Dept. of Public Safety*, 257 Ga. 300, 301 (2) (357 SE2d 569) (1987). However, the record shows that the jury was otherwise instructed that appellant's liability for the death of appellees' decedent was dependent upon its operation and maintenance of the swimming pool *as a nuisance*, which required the showing of a "defect or degree of misfeasance . . . to such a degree as would *exceed the concept of mere negligence. · . . .*" (Emphasis supplied.) Thus, although the trial court did not employ the words of appellant's refused request, it did instruct the jury that appellant's liability was dependent upon a showing of more than the mere negligent maintenance and operation of the swimming pool. Under these circumstances, it was not reversible error to fail to give the request to charge. See generally *Hutcheson v. City of Jesup*, 132 Ga. App. 84, 87 (3) (207 SE2d 547) (1974).

5. Appellant enumerates as error the failure to give a requested charge on assumption of the risk.

"The doctrine of assumption of risk applies in tort cases when a person without coercion of circumstances, pursues a course of conduct with full knowledge of its danger thereby exercising a free choice as to whether to engage in the act or not. [Cits.]" *Kitchens v. Winter Co. Bldrs.*, 161 Ga. App. 701, 702 (1) (289 SE2d 807) (1982). The evidence did not demand a finding that appellees' decedent, by voluntarily leaving the clear shallow end of the swimming pool, assumed, as a perceived risk, the likelihood that he, as a poor swimmer, would not be rescued should he encounter difficulties in the cloudy deep end of the pool. The evidence was, however, sufficient to create a jury issue in this regard. "[A]ssumption of the risk of the circumstances existing when [appellees' decedent] placed himself into the picture was arguably a factor. The jury was authorized to find that [,] by knowingly choosing to [venture into the cloudy deep end of the swimming pool, appellees' decedent] unreasonably assumed the risk incident thereto, which would be a complete bar to recovery. Or it could have found that such action did not invoke a choice of an obviously perilous course of conduct with full appreciation of the danger involved. If the latter had been the jury's finding, then there would be no basis for precluding recovery." *Newman v. Collins*, 186 Ga. App. 595, 597 (1a) (367 SE2d 866) (1988). By refusing to give the request to charge, the trial court erroneously denied appellant the opportunity to have the jury consider assumption of the risk as a complete defense to its liability. Since this error was not harmless, the grant of a new trial is mandated.

6. The trial court's failure to give a requested charge on the avoidance doctrine is enumerated as error. A review of the record

shows, however, that the trial court did give an adequate instruction to the jury on the avoidance doctrine, albeit in language which did not employ the exact wording of appellant's request. Accordingly, there was no error.

7. The trial court's failure to give appellant's requested charge on the definition of an actionable nuisance is enumerated as error. The record shows that this issue was likewise adequately covered in the charge as given.

8. The remaining enumeration of error need not be addressed as it is unlikely to recur at the retrial of the case.

*Judgment reversed. Deen, P. J., McMurray, P. J., Pope, Benham and Beasley, JJ., concur. Birdsong, C. J., Banke, P. J., and Sognier, J., dissent.*

SOGNIER, Judge, dissenting.

I respectfully dissent. Although I agree with the majority that the trial court's refusal to give appellant's requested charge on assumption of the risk was erroneous, I would not reach that issue, as I cannot agree with the majority that the evidence presented at trial was sufficient to withstand appellant's motions for a directed verdict as to the issues of nuisance and joint venture.

(a) Appellees asserted at trial that appellant was liable for their son's death under the theory of nuisance because appellant had failed to correct a hazardous condition in the pool it maintained. Conflicting testimony exists in the record regarding the condition of the pool, specifically the appearance of the water in the pool. Both the pool manager, Robert Woods, and one lifeguard testified that it had been "cloudy" in appearance off and on since the pool opened, and a second lifeguard agreed with them that it was cloudy on the day in issue. However, none of the pool personnel thought the condition of the water posed any danger, or that the pool should be closed. The lifeguards testified that after the pool closed on that particular day, they both swam and could see the bottom clearly. Judy Franklin testified that she and her five-year-old daughter were frequent users of the pool, and she never thought the pool had a murky or cloudy appearance. Franklin testified that on that particular day, her daughter had been allowed by Coach Woods to swim while the pool personnel were cleaning the pool after the pool closed, and that during that time, she was watching her daughter dive. She was certain she could see the bottom.

Unlike the majority, I find substantial material evidentiary differences in the record before this court at the prior appearance of this case and at present. The record in the prior case contained depositions, including that of Woods. However, Woods testified at trial, and since his deposition was not introduced at trial it did not become part

of the trial record. *Maloy v. Dixon*, 127 Ga. App. 151, 153-154 (1) (193 SE2d 19) (1972). Of course, the record in the summary judgment appeal did not contain trial testimony. I have examined the depositions in the prior record and find that at his deposition, Woods testified that the city's employee in charge of the water system "had showed me how to, well, clean out the dirty water, but that machine was broken and on many occasions I came by here to let him know that. You know, he came when he was here and when he wasn't here, he didn't come." This court obviously relied on that testimony in finding that the city had "repeated notice" of a problem with the water in the pool. Such testimony, however, was not given by Woods in his testimony at trial, nor were the depositions introduced at trial. They are thus not a part of the instant record. *Maloy*, supra. Consequently, the record on this appeal does not contain the same indication that appellant had actual notice. (This discrepancy between the record on summary judgment and at trial did not escape the notice of the trial court, for when appellees opposed appellant's motion for directed verdict on the issue of nuisance, counsel for appellees stated to the trial court that "[t]he facts as they went up to the Court of Appeals [in the appeal from grant of summary judgment to the city] are the identical facts that have been proved here today," to which the trial court responded, "I don't believe that's true.")

It is well established law that a municipality is not liable for negligence in the exercise of governmental functions. *Town of Fort Oglethorpe v. Phillips*, 224 Ga. 834, 838 (165 SE2d 141) (1968). The operation of recreational facilities is a governmental, rather than a ministerial, function. *Brannan v. City of Brunswick*, 49 Ga. App. 62, 68 (174 SE 186) (1934). However, "[a] municipal corporation, like any other individual or private corporation, may be liable for damages it causes to a third party from the operation or maintenance of a nuisance, irrespective of whether it is exercising a governmental or municipal function. [Cits.]" *Mayor &c. of Savannah v. Palmerio*, 242 Ga. 419, 426 (3) (g) (249 SE2d 224) (1978).

"Based on the holdings in *Town of Ft. Oglethorpe v. Phillips, Mayor &c. of Savannah v. Palmerio, . . .* and many other cases . . . the following guidelines appear [for deciding when a nuisance is established]: (1) The defect or degree of misfeasance must be to such a degree as would exceed the concept of mere negligence. (A single isolated act of negligence is not sufficient to show such a negligent trespass as would constitute a nuisance, [cit.]) (2) The act must be of some duration (two weeks in *Ft. Oglethorpe*, four hours held insufficient in [*City of Atlanta v. Roberts*, 133 Ga. App. 585 (211 SE2d 615) (1974)]) and the maintenance of the act or defect must be continuous or regularly repetitious (*Palmerio* and *Roberts*, supra). (3) *Failure of the municipality to act within a reasonable time after knowledge of*

*the defect or dangerous condition. (Ft. Oglethorpe,* supra.)" (Emphasis supplied.) *City of Bowman v. Gunnells,* 243 Ga. 809, 811 (256 SE2d 782) (1979). Applying these guidelines to the facts of the case at bar, even assuming the first two requirements are present, I am unable to find in the record any evidence that appellant had actual knowledge or notice of a dangerous condition. Conceding that the *county* may be held to have had notice of the alleged cloudy water through its employees, the pool manager and lifeguards, no evidence at trial established that the existence of this condition was actually communicated by the county to anyone employed by or representing appellant city.

Woods, the pool manager, was asked at trial: "[d]o you have a recollection of how many times you *attempted* to contact or *attempted* to get Mr. [Edwin] Hodges [appellant's employee in charge of the city water system] over to the pool before Roger's death?" (Emphasis supplied.) To this question, he responded "[o]ff the top of my head I would have to say about five times." However, other than before the pool opened, there is no indication in the record that Hodges was ever at the pool working on the equipment, that he was ever actually reached by Woods, or that he was called about a problem regarding water cloudiness. The lifeguard who is quoted by the majority as testifying that Hodges was there "[t]rying to clear the condition," had admitted only moments before that she did not "know exactly what he was working on." Hodges testified that he did not recall there being any problems with the system, and although he did recall Woods calling him back once, he testified that it was because the coach was out of the chemical reagents used for testing the pool. Hodges testified that he never failed to respond to any messages left by Woods, and that Woods never contacted him about the water being too cloudy or any other condition characterized as dangerous.

Since I find that the evidence of record does not support actual notice to appellant and notice or knowledge of the defect is one of the elements necessary to establishing the maintenance of a nuisance, see *City of Bowman,* supra, in my view a directed verdict in favor of appellant would have been proper on this issue unless the required knowledge by appellant was established constructively, through proof that appellant was engaged in a joint venture with the county, which clearly had notice. If it was, then notice to the county, its co-joint venturer, and its employees would also constitute notice to appellant under agency principles. See generally *Boatman v. Geo. Hyman Constr. Co.,* 157 Ga. App. 120, 122-124 (276 SE2d 272) (1981). I turn, therefore, to the question of whether appellant's motion for a directed verdict on the issue of the existence of a joint venture was properly denied.

(b) The record reveals that a group of citizens approached James

P. Marshall, appellant's mayor, in 1981 and requested that the public pool, which was owned by appellant but had been closed for some time, be reopened. Marshall testified at trial that he told the citizens' group appellant was not in a financial position to operate the pool, but that as a result of their request a committee was appointed to approach the Putnam County commissioners about the matter. The committee subsequently reported that they had reached an agreement with the county, the exact terms of which were the subject of conflicting testimony at trial, particularly as to the division of responsibility between the county and appellant for maintenance of the pool. However, the minutes of the county commission for June 22, 1981 were introduced into evidence, and show, in pertinent part, the following: "We have an estimate of $1,500.00 to put the swimming pool in operating order. We respectfully request that the County assume this cost and the operation of the pool for the benefit of the people of the entire county who wish to pay the usage fee. The second proposal was that the City [appellant] will put the pool in operating Condition and asks that the County operate [it] thereafter. The City to maintain the grounds outside of the swimming pool area. The City to furnish water and chemicals to operate the pool. Al Reaves, Director of [the County] Recreation Dept., was called in for discussion on the matter. Al stated that to operate the pool at least three certified people would be needed — two at the pool and one in the bath house area. He also suggested that advertisement for the jobs should be placed in [the] paper. Employees for these jobs will be paid $4.00 per hour [by the county]." Although the minutes do not so reflect, it is uncontroverted that appellant's offer to ready the pool was accepted and the plan went forward. The county commissioner's minutes for June 23, 1982, which were also admitted into evidence, indicate (and Mayor Marshall so testified) that the plan was again adopted in the following year: "[t]he Board [of Commissioners] was advised that the swimming pool is being readied and *will be operated by the [County] Recreation Department.* Director Al Reaves was advised to obtain life guards for the operation of the pool." (Emphasis supplied.) A small fee was charged to the users of the pool, and all such revenue was retained by Putnam County.

Traditionally, in speaking of the earmarks of a joint venture, it is said that " 'there is a joint enterprise or adventure when two or more combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, provided the arrangement does not establish a partnership.' [Cit.]" *Bowman v. Fuller,* 84 Ga. App. 421, 425 (1) (66 SE2d 249) (1951). Although there is no question that a municipal corporation such as appellant has the authority to enter into an arrangement with a county to provide recreational amenities for the citizens of both, OCGA § 36-34-3, it is problematic to me

whether such an arrangement, in which the intangible benefit of the citizenry is substituted for the traditional profit motive, could be termed a "joint venture." See generally *City of Brunswick v. Taylor*, 87 Ga. App. 751, 754 (75 SE2d 203) (1953). This is particularly true here, where all revenue from the undertaking was retained by the county. However, even assuming that such a joint venture by a governmental body is possible, it does not resolve the question of whether such a joint venture existed here, as the record before us does not establish the crucial element of "rights of mutual control." "There must be not only a joint interest in the objects and purposes of the undertaking, but also a right, express or implied of each member of the joint venture to direct and control the conduct of the other. [Cits.]" *Security Dev. &c. Co. v. Williamson*, 112 Ga. App. 524, 525 (1) (145 SE2d 581) (1965). See also *Time Fin. Svcs. v. Hewitt*, 139 Ga. App. 270, 272 (2) (228 SE2d 176) (1976). In my opinion, *Seckinger & Co. v. Foreman*, 252 Ga. 540, 541 (1) (314 SE2d 891) (1984), relied on by the majority, is persuasive as authority for the proposition that a joint enterprise may be found despite the absence of a profit motive and mutual control, only in the most limited of circumstances such as were there found. In *Seckinger*, the Supreme Court (using the "any evidence" standard because *Seckinger* was a workers' compensation case) found that a statement in *the agreement itself* providing that it was a joint venture agreement and should be deemed and construed as such, was sufficient to authorize a finding there of joint venture. Those narrow circumstances are not present here.

The question of whether or not the facts proved show a joint venture between the parties is generally a jury question. *Bowman*, supra at 426. However, a court may decide as a matter of law that no joint venture exists. See, e.g., *Castleberry v. Gold Agency*, 124 Ga. App. 694, 696 (1) (185 SE2d 557) (1971); *Georgia-Pacific Corp. v. First Nat. Bank of Atlanta*, 147 Ga. App. 292 (248 SE2d 554) (1978). In the case at bar, the minutes of the county commission clearly indicate that the pool would be "operated by" the county, thereby establishing the day-to-day operation and control of the pool as a county responsibility, rather than a joint one. The record is devoid of any indication that this control was mutual or joint. In my view there is, thus, no conflict in the evidence on the material issue of the terms of the agreement, regardless of any testimony from individuals purporting to give their "understanding" of the agreement. It follows that since the material element of right of joint control was missing, there was no joint enterprise, and I believe the trial court erred by denying appellant's motion for a directed verdict as to this issue. See generally *Citicorp Indus. Credit v. Rountree*, 185 Ga. App. 417, 422 (1) (364 SE2d 65) (1987).

(c) Having determined that no joint venture existed, the crucial

element of knowledge of a dangerous condition, necessary to showing appellant's maintenance of a nuisance, may not be supplied constructively. Accordingly, I also conclude that the trial court erred by denying appellant's motion for a directed verdict in its favor as to the issue of nuisance. See id.

I am authorized to state that Chief Judge Birdsong and Presiding Judge Banke join in this dissent.

DECIDED DECEMBER 5, 1988 —
REHEARING DENIED DECEMBER 20, 1988 — ■

*Burnside, Wall & Daniel, James W. Ellison,* for appellant.
*Andrew M. Scherffius III, John P. Batson,* for appellees.