### A09A1470. BUTLER et al. v. CARLISLE et al.
(683 SE2d 882)

MIKELL, Judge.

Shirley Haney Butler was walking along Academy Avenue ("Academy") as she was leaving the Mountain Moonshine Festival (the "Festival") in Dawsonville on October 25, 2003, when she was run over by a trailer attached to a truck driven by Gregory Layne Chastain. An antique car sat atop the trailer.[1] Mrs. Butler died as a result of her injuries. Her husband, N. Raymond Butler, filed a wrongful death action against Chastain, the City of Dawsonville (the "City"), and Billy Carlisle, the Sheriff of Dawson County. Butler's claims against the City and the Sheriff are premised in part on their alleged negligent failure to implement proper traffic and pedestrian control measures during the Festival. Butler claims that the City is liable for the Sheriff's allegedly negligent acts as a joint venturer based on an intergovernmental agreement entered into by the Dawson County Sheriff's Department and the City. Each defendant filed a motion for summary judgment, asserting, inter alia, that Butler's claims were barred by the Recreational Property Act, OCGA § 51-3-20 et seq. ("RPA"), and the public duty doctrine. The Sheriff also asserted that all claims against him were barred by sovereign and official immunity. The trial court granted the motions in a one-paragraph order, and Butler appeals. For reasons that follow, we affirm the grant of summary judgment to the Sheriff and reverse the grant of summary judgment to the City.

> On appeal from the grant of a motion for summary judgment, we conduct a de novo review of the law and evidence, viewing the evidence in the light most favorable to the nonmovant, to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law.[2]

"In other words, summary judgment is appropriate when the court,

---

[1] A parade during the Festival featured vintage race cars.

[2] (Footnote omitted.) *Heller v. City of Atlanta,* 290 Ga. App. 345, 346 (659 SE2d 617) (2008), aff'd, *Ga. Dept. of Transp. v. Heller,* 285 Ga. 262 (674 SE2d 914) (2009).

viewing all the facts and reasonable inferences from those facts in a light most favorable to the non-moving party, concludes that the evidence does not create a triable issue as to each essential element of the case."[3] Mindful of these principles, we review the facts of record insofar as they are relevant to the dispositive issues.

The record reveals that Academy is a narrow, two-lane street that has no sidewalks. Bridget Anderson, Mrs. Butler's adult daughter, deposed that at the time of the incident, vehicles were parked on both sides of the street, and no law enforcement officers or community volunteers were directing traffic. Anderson was in front of her mother as they walked single-file close to the white line on the right side of the street. When Anderson reached an area of wider pavement, she stopped to turn around and talk to her mother. Anderson heard her mother moan and then saw her "being twisted and turned like a rag doll" under Chastain's trailer. Chastain had come from behind Mrs. Butler, heading west on Academy, and he was pulling an oversized trailer that did not fit between the white lines. Chastain deposed that he was driving away from the Festival on State Route 53 ("Route 53"), and when he reached its intersection with Academy, a volunteer was detouring traffic from Route 53 onto Academy.

The record also shows that the City does not have its own police department or fire department. The Dawson County Sheriff's Department provides law enforcement services for the City pursuant to an intergovernmental agreement entered into by the City, Dawson County, and the Sheriff's Department.[4] The agreement specifies the services to be performed by the Sheriff's Department, expressly including assistance for the Festival. The agreement obligates the Sheriff to "devote sufficient time and effort" and to supply all "equipment, manpower . . . and vehicles required to perform" the specified services.

In August 2003, the Star Bright Foundation submitted to the City an application for a "parade or public or public assembly permit" to hold its annual Festival on October 25 and 26. The application contained a page completed and signed by the Sheriff which listed the route and place of assembly, and recommended the assistance of nine officers and vehicles. On a separate page, the application states that no unusual problems concerning traffic congestion were anticipated because the Foundation had the "cooperation and assistance" of the Sheriff's Department "as well as other volunteers to control all traffic." This portion of the application

---

[3] *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4) (405 SE2d 474) (1991).

[4] The county fire department provides fire protection services to the City pursuant to a similar intergovernmental agreement.

states that between nine and twelve law enforcement officers would be needed.

The City submitted the application to the Georgia Department of Transportation ("DOT"), as is required when a local government desires to have an event that will impact a state route. Joseph M. Garland, DOT's traffic design engineer, approved the "traffic control plan" contingent on certain conditions, including:

> [a]ll detour signing will conform to the Manual on Uniform Traffic Control Devices [MUTCD]; assurance that uniform officers will be stationed at all State Route intersections to assist with traffic control problems and will remain there until this event is concluded; [and] [t]he route will be as indicated in your correspondence.

The letter was sent to the City, but the Sheriff never received a copy of it.

At issue, however, is the "traffic control plan" itself. No plan was attached to the application. According to Garland, a traffic control plan was on file at the DOT from 1992 to 2003, but the plan did not indicate whether Academy was supposed to be one-way or two-way during the Festival. However, Garland reiterated that the DOT contingency required that a uniformed officer be stationed at the intersection of Route 53 and Academy. During discovery, the City produced a diagram of a purported detour map, which has arrows indicating one-way traffic on Academy. The diagram is undated except for the facsimile transmission date of July 2004.

The county fire marshal in 2003, Kenneth Wayne Grosch, testified that he had recommended and approved a plan calling for one-way traffic on Academy. Grosch also opined that on that Saturday, there were two to three times as many people as normally attend the Festival, and they were "terribly shorthanded," and the deputies did not have enough manpower to handle the crowd. Butler alleged in his complaint that the Festival brought approximately 80,000 visitors to the City.

The Sheriff was deposed before he was added as a defendant. In his deposition, the Sheriff testified that he has twenty sworn officers assigned to the patrol division and that he generally devotes seven or eight officers to the Festival. The Sheriff also testified that he was not familiar with the MUTCD and did not know that the DOT required detour signs to conform with it. The Sheriff had not been shown the DOT approval letter containing the three contingencies, although he was aware that the DOT required officers to be stationed at all the state route intersections. When presented with the City's diagram of a purported detour map, the Sheriff testified

that it appeared that traffic heading east on Route 53 into the City was rerouted down Academy, and that Academy was supposed to have one-way traffic. In fact, traffic on Academy was permitted to proceed in both directions during the Festival. The Sheriff also testified, however, that he could only assume that the diagram was the "traffic control plan" submitted to the DOT because Butler's counsel showed it to him. The Sheriff subsequently submitted an affidavit in support of his motion for summary judgment, stating that the diagram shown to him at his deposition had not been submitted to him with the Festival application and that he did not know who created it.

## Claims Against Sheriff Carlisle

1. The doctrine of sovereign immunity, which the Sheriff has raised as a defense, bars any claims against him in his official capacity. Under the Georgia Constitution, as amended in 1991,

> sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.[5]

Sovereign immunity has been extended to counties[6] and thus protects county employees who are sued in their official capacities, unless sovereign immunity has been waived.[7] Any waiver of sovereign immunity must be established by the party seeking to benefit from that waiver.[8]

Butler argues that sovereign immunity has been waived by virtue of the intergovernmental agreement, pursuant to which the Sheriff's Department assumed the City's law enforcement duties. Butler argues that the Sheriff and the City may be held jointly and severally liable for the tortious acts of the other under the theory of joint venture.[9] In support of his argument, Butler cites *City of*

---

[5] Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e).

[6] *Gilbert v. Richardson*, 264 Ga. 744, 747 (2) (452 SE2d 476) (1994).

[7] *Seay v. Cleveland*, 270 Ga. 64, 65 (1) (508 SE2d 159) (1998); *Banks v. Happoldt*, 271 Ga. App. 146, 147 (1) (608 SE2d 741) (2004).

[8] *Scott v. City of Valdosta*, 280 Ga. App. 481, 484 (1) (634 SE2d 472) (2006); *Banks*, supra at 148 (1).

[9] *DeKalb County v. Lenowitz*, 218 Ga. App. 884, 887 (1) (463 SE2d 539) (1995) (sewer

*Eatonton v. Few*,[10] in which we held that a city was not entitled to judgment as a matter of law on a nuisance claim based on a drowning at its swimming pool because there was evidence that the city shared operating and maintenance costs of the pool with the county and, therefore, was involved in a joint enterprise.[11] As noted in *Few*, the state Constitution specifically. authorizes a county and a municipality to enter into joint agreements for the provision of services, or for the joint or separate use of facilities or equipment.[12] In *Few*, however, the case against the city proceeded under a nuisance theory. "A municipality[,] like any other individual or private corporation[,] may be liable for damages it causes to a third party from the operation or maintenance of a nuisance, irrespective of whether it is exercising a governmental or a ministerial function."[13] Thus, *Few* did not involve the sovereign immunity defense asserted by the Sheriff. Although the Constitution permits intergovernmental agreements, it provides for a waiver of sovereign immunity only by an Act of the General Assembly. Butler has not shown that an Act of the General Assembly specifically waived the sovereign immunity protecting the Sheriff. Absent such a waiver, the trial court did not err in granting summary judgment to the Sheriff as to any claims asserted against him in his official capacity.[14]

2. The Sheriff asserts that the doctrine of official immunity bars claims against him in his individual capacity because, at all relevant times, he was performing discretionary acts within the scope of his official authority. We conclude that the majority of the acts complained of were discretionary. In addition, to the extent that certain acts were ministerial, we conclude that the Sheriff's alleged failure to perform them did not cause the death of Mrs. Butler.[15] Accordingly, we conclude that the trial court did not err in granting summary judgment to the Sheriff for claims asserted against him in his individual capacity.

Under the doctrine of official immunity, "a public officer . . . may be personally liable only for ministerial acts negligently performed or

---

agreement between DeKalb County and the City of Atlanta showed that they jointly owned and controlled sewer system, which was thus a joint enterprise, so that each party could be held jointly and severally liable for the tortious acts of the other committed within the scope of the enterprise).

[10] 189 Ga. App. 687 (377 SE2d 504) (1988) (whole court).

[11] Id. at 690 (2).

[12] Id., citing Ga. Const. of 1983, Art. IX, Sec. III, Par. I (a).

[13] (Citations omitted.) *Town of Fort Oglethorpe v. Phillips*, 224 Ga. 834, 837-838 (165 SE2d 141) (1968).

[14] *Banks*, supra.

[15] See Division 2 (c), infra.

acts performed with malice or an intent to injure."[16]

> A suit against a public official in his or her individual capacity is barred by official immunity where the public official has engaged in discretionary acts that are within the scope of his or her authority, and the official has not acted in a wilful or wanton manner; with actual malice; or with the actual intent to cause injury.[17]

In this case, Butler does not allege that the Sheriff acted wilfully or wantonly, with malice, or with the intent to injure his late wife. Butler contends that the Sheriff either negligently failed to perform certain ministerial acts or performed ministerial acts in a negligent fashion. The distinction between ministerial acts and discretionary acts is explained as follows:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.[18]

> Analysis of a public official's acts as ministerial or discretionary is dependent upon the facts of the individual case, particularly such fact or facts as specifically relevant to the official act or omission from which liability arises. The question whether a duty is ministerial or discretionary turns on the character of the specific act, not the general nature of the official's position.[19]

We examine the nature of the Sheriff's acts in this case in light of Butler's specifications of negligence against him.

(a) Butler argues that the Sheriff breached a duty to formulate a pedestrian control plan. In this regard, a traffic control engineer, Dr. Peter Parsonson, testified that a plan to separate vehicular traffic from pedestrian traffic was necessary, assuming there were 80,000

---

[16] (Footnote omitted.) *Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001).

[17] (Citations and punctuation omitted.) *Ga. Dept. of Transp.*, supra at 266-267 (2), citing Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d).

[18] (Citation omitted.) *Standard v. Hobbs*, 263 Ga. App. 873, 875 (1) (589 SE2d 634) (2003).

[19] (Punctuation and footnotes omitted.) *Daley v. Clark*, 282 Ga. App. 235, 238 (2) (638 SE2d 376) (2006).

Festival attendees, as Butler asserted. Pretermitting whether the Sheriff had such a duty, the creation of a pedestrian control plan would require the Sheriff to exercise personal deliberation and judgment. In *Murphy v. Bajjani*,[20] our Supreme Court held that a statute mandating creation of a school safety plan "calls for the plan's creator to exercise a discretionary duty."[21] It follows in this case that creating a plan to separate vehicular traffic from pedestrian traffic would call for the exercise of discretion. As the creation of a pedestrian control plan is a discretionary function, the doctrine of official immunity bars any negligence claim against the Sheriff in his individual capacity for failing to formulate such a plan.

(b) Butler contends that the Sheriff had a ministerial duty to enforce one-way traffic on Academy. Pretermitting whether traffic enforcement could be deemed a ministerial act, Butler's argument fails because there is no evidence of record that the Sheriff had a duty to implement one-way traffic on Academy. The Sheriff testified that until he was deposed, he had not seen the diagram provided by the City during discovery. The traffic map on file at the DOT did not require one-way traffic on Academy. Although the fire marshal testified that traffic "was intended to be one way," and that he had made the recommendation to "[e]verybody involved in the planning of it, including the mayor on down," he also testified that he.had not seen the diagram produced by the City until his deposition. The fire marshal's testimony does not raise an issue of fact as to whether the Sheriff had a duty to require one-way traffic on Academy during the Festival.

(c) Butler additionally argues that the Sheriff breached ministerial duties to follow the DOT's directives. Indeed, a county employee's duty to perform as directed by the DOT has been deemed ministerial.[22] In this case, the DOT approved the City's application based on the following conditions: that the City place detour signs that conform with the MUTCD, station officers at state route intersections, and follow the traffic plan on file. At the outset, we note that the Sheriff was never shown this letter. Pretermitting whether the Sheriff could be held liable under a joint venture theory with the City for failing to follow these directives, we find no evidence for the factfinder as to

---

[20] 282 Ga. 197 (647 SE2d 54) (2007).

[21] (Citations omitted.) Id. at 199-200 (1).

[22] *Lincoln County v. Edmond*, 231 Ga. App. 871, 875 (2) (501 SE2d 38) (1998) (county employee's obligation to remove fallen tree from roadway deemed ministerial); *Joyce v. Van Arsdale*, 196 Ga. App. 95, 96-97 (395 SE2d 275) (1990) (employee who was directed by the county commission to comply with the DOT's request to close a bridge performed a ministerial duty in putting up barricades and signs).

whether any such breach of duty caused the fatal incident.[23]

With regard to the first two directives, there is no evidence that the absence of either a detour sign or a uniformed officer at the critical intersection — Route 53 and Academy — contributed to the cause of the incident. Chastain's trailer ran over Mrs. Butler after he turned onto Academy from Route 53, where a volunteer was directing traffic. There is no evidence, or any reasonable inference that may be drawn from the evidence, that either a detour sign or a uniformed officer, as opposed to a volunteer, would have avoided the collision. Butler's contention that the Sheriff violated a local ordinance by permitting a volunteer to direct traffic is incorrect. The ordinance governing parade permits states that the mayor cannot *require* private organizations to provide personnel for traffic control, but there is no prohibition against it. And, as noted above, the traffic control map on record with the DOT did not require one-way traffic. In sum, there is no evidence that, even if the Sheriff violated any DOT directive, such violation contributed to the death of Mrs. Butler.

(d) The remaining specifications of negligence, to the extent they are made against the Sheriff, involve law enforcement functions that required the exercise of personal deliberation on the part of the Sheriff. "[T]his Court has consistently held that the operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function as opposed to a ministerial, proprietary, or administratively routine function."[24] Deciding how many officers to utilize, for example, called for the exercise of discretion, regardless of the number the Sheriff may have written on an application. In any event, the Sheriff testified that he had seven or eight officers, in addition to himself, and there was at least one volunteer directing traffic at an intersection. There is no evidence that the Sheriff was aware that the crowd would be larger than usual. In fact, the fire marshal deposed that the number of people attending took them by surprise. Gauging a crowd, and providing sufficient manpower to control it, are matters that call for the exercise of personal deliberation and judgment.[25]

---

[23] See *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982), reciting the four essential elements of a negligence claim:
> (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

(Citation and punctuation omitted.)

[24] (Citations and footnotes omitted.) *Harvey v. Nichols*, 260 Ga. App. 187, 191 (1) (a) (581 SE2d 272) (2003); *Lowe v. Jones County*, 231 Ga. App. 372, 373 (3) (499 SE2d 348) (1998).

[25] Compare *Nelson v. Spalding County*, 249 Ga. 334, 336 (2) (a) (290 SE2d 915) (1982)

For all of the reasons set forth above, we conclude that the trial court properly granted summary judgment to the Sheriff on the negligence claims asserted against him in his individual capacity.

### Claims Against the City

3. Butler asserts that the City was negligent in numerous respects, including failing to devise a safe route for traffic that was diverted from Route 53 onto Academy. Specifically, Butler asserts that the City was negligent in failing to heed the fire marshal's recommendation to implement one-way vehicular traffic on Academy during the Festival. Butler relies on *City of Douglasville v. Queen*,[26] in which our Supreme Court recognized that, "[i]n regard to the affirmative act of planning and executing a parade, the [c]ity owed parade spectators a duty to exercise ordinary care for their protection."[27] However, the Court went on to hold in *Queen* that the city was entitled to summary judgment because there was no evidence that it breached that duty.[28]

Unlike in *Queen*, in this case there are inferences that may be adduced from the evidence that create a question for the factfinder regarding whether the City breached a duty to exercise ordinary care to protect the Festival attendees. The City produced during discovery a diagram appearing to represent a plan for one-way traffic on Academy, which is a City-owned street, during the Festival. The fire marshal deposed that he had discussed the need for one-way traffic with the mayor. Such evidence permits an inference that the City knew, or should have known, that permitting two-way traffic on Academy — a narrow street that did not have sidewalks — would present an unreasonable risk of harm to pedestrians who would need to traverse Academy during the Festival. Moreover, there is evidence that Mrs. Butler had to walk in the same direction as Chastain's truck was traveling. In other words, there is an inference of causation. Finally, we construe this specification of negligence as an act of misfeasance, for which the City may be held liable, rather than discretionary nonfeasance, for which the City may not be held liable pursuant to OCGA § 36-33-2.[29]

The City contends that it delegated all duties regarding the

---

(warden's duty to replace signs did not encompass "policy decisions on where traffic control is needed" and was thus ministerial).

[26] 270 Ga. 770 (514 SE2d 195) (1999).

[27] (Citation omitted.) Id. at 772 (3).

[28] Id.

[29] See id. at 772 (2), (3) (distinguishing acts of misfeasance from those of nonfeasance). OCGA § 36-33-2 states: "Where municipal corporations are not required by statute to perform an act, they may not be held liable for exercising their discretion in failing to perform the act."

Festival to the Sheriff pursuant to the intergovernmental agreement. We do not agree. Although the agreement delegated responsibility for the City's law enforcement to the Sheriff and required him to provide necessary manpower for the Festival, the agreement did not delegate all duties regarding planning the Festival. It was the City, not the Sheriff, that submitted the application for approval of the Festival to the DOT and received a response from the DOT. Summary adjudication is proper only in "plain and palpable cases where reasonable minds cannot differ as to the conclusion to be reached."[30] This is not such a case. The extent of the City's involvement in planning the Festival, and whether it breached an affirmative duty to exercise ordinary care for the protection of those who attended it, are matters that must be decided by a jury. The trial court erred in granting summary judgment to the City.

4. We reject the City's contention that it is insulated from liability by the public duty doctrine. That doctrine provides that "liability does not attach where the duty owed by the governmental unit runs to the public in general and not to any particular member of the public, except where there is a special relationship between the governmental unit and the individual giving rise to a particular duty owed to that individual."[31] The City argues that it has no "special relationship" with the decedent and as such, cannot be held liable for her injuries. We disagree. The doctrine addresses only the provision of police *protection* services, such as requests for emergency help.[32] It has no application to a claim of misfeasance in planning a festival.

5. Finally, the City argues that Butler's claims are barred by the RPA. "[T]he RPA limits, with certain exceptions, the liability of an owner of land who has made property available without charge to the public for 'recreational purposes.'"[33] The Supreme Court has adopted a balancing test to determine when mixed-use property, or that which has both commercial and recreational aspects, is used for "recreational purposes" within the meaning of the RPA.[34] The balancing test "requires that all social and economic aspects of the activity be examined. Relevant considerations on this question include, without limitation, the intrinsic nature of the activity, the type of service or commodity offered to the public, and the activity's

---

[30] (Citation and punctuation omitted.) *Lau's Corp.*, supra at 493 (2).

[31] (Citation and punctuation omitted.) *City of Rome v. Jordan*, 263 Ga. 26, 27 (1) (426 SE2d 861) (1993).

[32] See id. Accord *Gregory v. Clive*, 282 Ga. 476, 478 (651 SE2d 709) (2007).

[33] (Citation omitted.) *Atlanta Committee for the Olympic Games v. Hawthorne*, 278 Ga. 116 (598 SE2d 471) (2004).

[34] Id. at 116, 117 (1).

purpose and consequence."[35]

Even where there is no factual dispute over the recreational and commercial activities on the property, summary judgment is improper

> where a fact question regarding the owner's purpose is created by objective evidence, such as proof that the owner knowingly obtained, directly or indirectly, financial benefits for the purpose of pecuniary gain from business interests on the property as a result of its decision to invite or permit the public without charge to enter the property.[36]

The Supreme Court has made clear that "summary adjudication of this issue is appropriate only in plain and palpable cases where reasonable minds cannot differ as to the conclusion to be reached."[37]

We have carefully reviewed the evidence of record and conclude that this issue is not susceptible to summary adjudication. In accordance with the principles announced in *Hawthorne* and *Anderson*, the trial court must submit the issue to the jury to perform the balancing test, considering the totality of the circumstances.[38] Upon the jury's resolution of the factual issue, the trial court must apply the jury's finding and determine as a matter of law whether or not the RPA applies to limit the City's liability in this case.[39]

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Ellington, J., concur.*

DECIDED AUGUST 21, 2009 ▉

*Burnside & Wall, James B. Wall, James W. Ellison*, for appellants.

*Williams, Morris & Blum, Terry E. Williams, McClure, Ramsay, Dickerson & Escoe, Larry L. Hicks II, Jason C. Waymire*, for appellees.

---

[35] (Citation and emphasis omitted.) *Anderson v. Atlanta Committee for the Olympic Games*, 273 Ga. 113, 116-117 (2) (537 SE2d 345) (2000).

[36] *Hawthorne*, supra at 117-118 (1).

[37] (Punctuation omitted.) Id. at 118 (1), citing *Lau's Corp.*, supra.

[38] Id.; *Anderson*, supra.

[39] *Hawthorne*, supra.