**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 19, 2023**

# In the Court of Appeals of Georgia

A23A0676. UPSHAW et al v. COLUMBUS CONSOLIDATED
      GOVERNMENT et al.

GOBEIL, Judge.

Karisha Upshaw, individually as the Parent of Deonte Giles, deceased, and as Administrator of the Estate; and Mary Adams Staten, as next of kin of A. M., Giles's minor child (collectively, "Plaintiffs"), appeal from the State Court of Muscogee County's grant of summary judgment to the Columbus Consolidated Government ("Columbus");[1] Richard Boren, Chief of Police of the Columbus Police Department ("CPD");[2] and Officer Ryan Vardman of the CPD (collectively, the "Defendants"), in this underlying wrongful death and negligence action arising from a high-speed

---

[1] "The governments of the City of Columbus and Muscogee County are consolidated." *Peters v. Followill*, 269 Ga. 119, 120 n. 1 (497 SE2d 789) (1998).

[2] Chief Boren retired from the CPD on October 31, 2020.

police pursuit and exercise of deadly force. On appeal, Plaintiffs contend the state court erred in (1) finding that Officer Vardman acted with legal justification in intentionally driving into Giles because Vardman admitted that he acted to stop Giles from fleeing; (2) utilizing the wrong legal standard in finding that Chief Boren was not liable for the negligent hiring and retention of Vardman; and (3) finding that Vardman's use of his police vehicle to hit Giles was not a use of a "covered motor vehicle" as defined by OCGA § 36-92-2, the statutory exception to sovereign immunity. For the reasons that follow, we affirm.

"We review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact." *Porter v. Massarelli*, 303 Ga. App. 91, 91 (692 SE2d 722) (2010) (citation and punctuation omitted). Viewed in this light, the evidence showed that on May 18, 2017, at approximately 11 a.m., Gerrika McCracken, who shared a child (A. M.) with Giles, called 911 and reported that Giles had just driven past her vehicle and pointed a gun at her. She described the gun as "a .38 with black duct tape at . . . the bottom . . . at the handle." McCracken gave 911 a physical description of Giles and stated that he was driving a silver Ford Fusion with an out-of-state license plate. A few minutes later, the 911 dispatch sent Officer

2

Vardman a description of Giles's vehicle and also informed Vardman that Giles had a gun and an outstanding arrest warrant for murder. Shortly thereafter, officers spotted a vehicle matching the description from the 911 call with "multiple occupants" inside.

A high-speed pursuit ensued involving multiple CPD officers, with Vardman acting as the lead pursuit vehicle. During the chase, Giles's vehicle reached speeds of 70 miles per hour, drove on the wrong side of the street, and ran a stop sign. As the police vehicles involved in the chase approached Giles's vehicle, CPD Officer Michael Balauitan activated his lights and siren and started driving down Cusseta Road in the direction of Giles's vehicle, followed by Officer Sonny Wiseman. At approximately 11:35 a.m., with Vardman still in pursuit, Giles crossed the center line into oncoming traffic on Cusseta Road and headed straight towards Balauitan's police vehicle, which was traveling from the opposite direction.

Balauitan observed Giles's car heading towards him and, in a bid to avoid a head-on collision, he turned his police car sharply to the left to use the passenger side of his vehicle as a shield. Giles's car clipped the right rear bumper of Balauitan's cruiser and the impact of the collision spun Balauitan's car into a telephone pole to a stop. As a result of the crash, Balauitan sustained injuries and his car was destroyed.

3

The Georgia State Patrol's Collision Analysis Report later determined that Giles's vehicle was traveling at a speed of 73 miles per hour 5 seconds before colliding with Balauitan and accelerated to 78 miles per hour until the vehicle's brakes were applied less than a second before impact. The report also showed that Giles's vehicle turned to the right 1.3 seconds before the collision, which placed it in the direct path of Balauitan's cruiser, which was turning to the left to avoid being hit.

Immediately after the collision, Giles climbed out of the driver's side window of his vehicle, and Vardman observed a black object in Giles's hand, which he believed to be a gun. Vardman later recounted that he did not believe that Giles intended to surrender because he was exiting his vehicle in a hurry and did not put his hands up. According to Vardman:

> I angled my patrol vehicle, and I knew I was gonna . . . hit him and then was still gonna crash into the car because he was in between my patrol vehicle and that car. I still made the . . . conscious decision to go ahead to stop him and struck him with my patrol [vehicle]. Knowing at the time, it was . . . deadly force and what the outcome was probably going to be . . . . Based on his actions before, it didn't appear he had any regard for his own life or anyone else's life. And that, to me . . . was the safest way for the general public. I don't know safest way for me. But, making a split second decision to either do that or possibly end up having a gun battle in the middle of Cusseta Road, where other people would be in the

4

line of fire, I made what I thought . . . was the safest route to go ahead and stop the threat, which deadly force, defined in Georgia, allows me to do.

Vardman further explained his decision to use deadly force based on the fact that Giles had (1) pointed a gun at McCracken; (2) an outstanding warrant for murder; (3) intentionally tried to ram his car into a police vehicle at approximately 70 miles per hour; and (4) what appeared to be a gun in his hand. Vardman struck Giles with his police cruiser, which pulled Giles under Vardman's vehicle, which then collided with Giles's vehicle. Immediately after the crash, Vardman exited his cruiser and tackled Devin Bolen (the passenger in Giles's car) to the ground, who had jumped out of the vehicle and attempted to flee. A group of officers then lifted Vardman's car off of Giles. Emergency responders pronounced Giles dead at the scene.

Both Vardman and Balauitan observed a gun matching the description provided by McCracken in the 911 call — a .38 caliber revolver with tape around its handle — on the ground next to Giles's vehicle in the immediate aftermath of the collision. The Georgia Bureau of Investigation took the gun into custody and later recovered Giles's fingerprints on the weapon.

5

In accordance with CPD policy, Officer Vardman was placed on paid administrative leave pending an investigation by its Office of Professional Standards ("OPS"). At the conclusion of its investigation, OPS cleared Vardman of any wrongdoing.

On May 20, 2019, Upshaw and McCracken filed a complaint in state court, alleging that the Defendants violated Giles's Fourth, Eighth, and Fourteenth Amendment rights pursuant to 42 USC §§ 1983 and 1988; and raising claims for negligence, gross negligence, negligence per se and wrongful death.[3] The Defendants removed the matter to federal court and filed a motion for summary judgment. Shortly thereafter, Upshaw and McCracken voluntarily moved to dismiss the action without prejudice, which the federal district court granted on February 3, 2021.

On August 2, 2021, Plaintiffs[4] filed the instant renewal action against the Defendants, raising claims for "prima facie tort, negligence, wrongful death, and gross negligence." The Defendants, including Officer Vardman and Chief Boren in their official capacities, moved to dismiss the action on the basis of sovereign

---

[3] The pleadings from the 2019 lawsuit are not part of the record in the instant appeal.

[4] Staten, A. M.'s grandmother and legal guardian, replaced McCracken as a named plaintiff in the renewal action.

immunity. Vardman and Boren then filed a separate motion for summary judgment on all claims against them in their individual capacities based on qualified immunity. The Defendants, in their official capacities, also filed a motion for summary judgment, which supplanted their previously filed motion to dismiss. Plaintiffs filed an amended complaint, in which they added a claim for negligence per se and argued that Columbus had waived its sovereign immunity pursuant to OCGA § 36-92-2 (a) because Giles's death resulted from Vardman's negligent use of his police cruiser as a "covered motor vehicle."

In an order dated August 20, 2022, the state court granted both summary judgment motions. First, the state court found that the doctrine of qualified immunity barred Plaintiffs' claims against Vardman and Boren in their individual capacities. Specifically, the court found that

> it is clear from the facts, including graphic audio files, that Vardman's act in deliberately striking [Giles] was willful. Officer Vardman intended to use deadly force to neutralize what he perceived as an existential threat to himself and others. . . .The evidence is clear that Officer Vardman had reason to believe [Giles] posed an immediate threat of violence to the officer and to others. There is no evidence that Officer Vardman acted for any reason other than to neutralize the reasonably perceived threat posed by [Giles].

7

Regarding Plaintiffs' claim against Chief Boren for his alleged negligent hiring, retention, training, and supervision of Vardman, the court found "there is no evidence that Chief Boren acted with willful, malicious, or specific intent to harm [Giles]."

Finally, with respect to Plaintiffs' claims against the Defendants in their official capacities, the court found, in pertinent part, that Plaintiffs had failed to show that Columbus waived its sovereign immunity via the application of OCGA § 36-92-2 (a), reasoning as follows:

> While [ ] Plaintiff[s'] suit alleges negligent use of the vehicle by Vardman, there are no facts in the record to show that the collision resulting in the death of [Giles] was anything other than a deliberate exercise of Officer Vardman's professional judgment to use the vehicle, not as a "covered motor vehicle," but as a weapon to neutralize a threat.

Additionally, the court found that, pursuant to OCGA § 36-92-3 (b),[5] the individual employees, acting within the scope of their employment, may not be sued in the same action in their official capacities. This appeal followed.

---

[5] OCGA § 36-92-3 (b) provides: "A person bringing an action against a local government entity under the provisions of this chapter shall name as a party defendant the local government entity for which the officer or employee was acting and shall not name the local government officer or employee individually."

8

1. Plaintiffs allege that the state court erred by finding that Vardman acted with legal justification in intentionally driving into Giles because Vardman admitted that he acted to stop Giles from fleeing. As explained below, Plaintiffs' claims against Vardman in his individual capacity are barred by official immunity.

Official immunity — also called qualified immunity — provides limited protection to public officers and employees from suit in their personal capacity. *Grammens v. Dollar*, 287 Ga. 618, 619 (697 SE2d 775) (2010). Whether a government official is entitled to official immunity is a question of law that we review de novo. *Lowe v. Etheridge*, 361 Ga. App. 182, 182 (862 SE2d 158) (2021). The Georgia Constitution provides that government officials may not be held personally liable for performing discretionary acts[6] unless they act "with actual malice or with actual intent to cause injury in the performance of their official functions." *Mercado v. Swoope*, 340 Ga. App. 647, 650 (798 SE2d 291) (2017) (citing Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d); punctuation omitted). In this context, our Supreme Court has held that "'actual malice' requires a deliberate intention to do wrong," and

---

[6] The parties do not dispute that Vardman's use of force was a discretionary act. See *Morgan v. Barnes*, 221 Ga. App. 653, 654-655 (472 SE2d 480) (1996) (decision to pursue car that had eluded other officers and was believed to be stolen was discretionary); *Kidd v. Coates*, 271 Ga. 33, 33 (518 SE2d 124) (1999) (law enforcement officer exercises discretion in firing a gun at a suspect).

9

an "['] actual intent to cause injury[']has been defined as an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." *Mercado*, 340 Ga. App. at 650 (citations and punctuation omitted). Significantly, in evaluating official immunity, we have held that intentional acts done with legal justification — such as in self-defense — do not amount to tortious acts. *Porter*, 303 Ga. App. at 96 (2).

> In the context of a shooting by a [law enforcement] officer, the Supreme Court of Georgia has held that if the officer shot intentionally and without justification, then he acted solely with the tortious actual intent to cause injury and would not be protected by official immunity. If, however, the officer shot in self-defense, then he had no actual tortious intent to harm, but acted only with the justifiable intent which occurs in every case of self-defense, which is to use such force as is reasonably believed to be necessary to prevent death or great bodily injury to themselves or the commission of a forcible felony.

Id. (appeal from grant of summary judgment in favor of officer in action alleging excessive force during a traffic stop) (citation and punctuation omitted). See also *McNeil v. Parker*, 169 Ga. App. 756, 756 (315 SE2d 270) (1984) ("[OCGA § 16-3-21

10

(a)[7]] supplies the basis of justification that a person who has committed a battery may assert as a defense in a civil suit over the battery."). "Such questions of reasonable belief, necessary or unnecessary force, initial aggression, and retreat are ordinarily issues of fact reserved for jury resolution." *McNeil*, 169 Ga. App. at 756-757.

Here, the state court found that "Vardman's act in deliberately striking [Giles] was willfull." Specifically, the court noted that Vardman intended to use his car to "neutralize" the perceived threat posed by Giles as Vardman had reason to believe that Giles posed an immediate threat of violence to the officers on the scene and other members of the public. Plaintiffs counter that "there exists a disputed question of fact as to whether Vardman acted in justifiable defense of himself or others, or merely was

---

[7] OCGA § 16-3-21 (a) provides:

A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23 [pertaining to the use of force in defense of habitation], a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

11

acting to prevent someone from fleeing." Viewing the evidence in the light most favorable to non-movants Plaintiffs, as we must on a motion for summary judgment, the record shows that Giles: pointed a gun at McCracken; had an outstanding warrant for murder; led officers on a high speed chase that resulted in his vehicle crashing into a police cruiser at approximately 70 miles per hour; refused to surrender after the crash; and had what appeared to be a gun in his hand after he got out of his vehicle.

Plaintiffs maintain that there remains a factual dispute as to whether Giles intentionally rammed Balauitan during the high speed chase. However, even assuming that Giles was not intentionally targeting Balauitan, there is no evidence contradicting Vardman's first-hand account (corroborated by dash cam videos of the incident) that Giles, a murder suspect with a possible weapon in his possession, was driving at a high rate of speed into oncoming traffic in the midst of a high-speed pursuit. See *Vidal v. Leavell*, 333 Ga. App. 159, 161 n. 2 (775 SE2d 633) (2015) (noting that, when reviewing trial court's ruling on motion for summary judgment, appellate court "must rely upon facts as depicted by the videotape"), overruled on other grounds by *Rivera v. Washington*, 298 Ga. 770, 778 n. 7 (784 SE2d 775) (2016). Plaintiffs also assert that there remains an issue of fact as to whether Giles was armed at the time of his death. Again, the record evidence shows that Giles had

12

pointed a gun at McCracken prior to the high-speed chase, and Vardman saw Giles exit his car, after the collision with Balauitan's cruiser, holding an object that Vardman believed to be a gun. Moreover, a gun with Giles's fingerprints and matching the description of the weapon that Giles pointed at McCracken before the chase, was found at the scene next to Giles's vehicle. Importantly, Plaintiffs point to no evidence that Giles was unarmed, that Vardman did not have a reasonable belief that deadly force was necessary, or that a gun was "planted" beside Giles's vehicle. See *Hill v. Jackson*, 336 Ga. App. 679, 681 (783 SE2d 719) (2016) ("[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment") (citation and punctuation omitted).

As outlined by the trial court's thoughtful opinion:

There is no pleasant way for a law enforcement agent or agents to utilize deadly force regardless of the justification. The deliberate use of violent deadly force by a person vested with the authority to use it should be of concern to all citizens. Indeed, there are safeguards under our state laws designed to investigate and protect against unjustified use[ ] of lethal force. Our federal government has additional safeguards of which [ ] Plaintiffs have opted not to avail themselves.

13

Of equal importance are the safeguards built into our legal system that allow our governmental agencies to protect us by using law enforcement agents trained and capable of exercising discretion in life-or-death situations requiring immediate and decisive action.

Given the totality of the circumstances, an objective officer in Vardman's situation reasonably could have believed that Giles posed a threat of serious physical injury to civilian motorists and to the officers themselves. Vardman's decision to eliminate the threat of danger to bystanders and officers by striking Giles with his vehicle was therefore objectively reasonable, and Plaintiffs failed to put forth any evidence that Vardman acted with malice or an actual intent to cause injury. See *Kidd v. Coates*, 271 Ga. 33, 34 (518 SE2d 124) (1999) (evidence supported finding that law enforcement officers who shot and killed resident while executing "no-knock" search warrant in his residence acted in self-defense, and thus, because they acted without "actual intent to cause injury," they were entitled to official immunity in ensuing wrongful death action; officers showed that they saw resident point gun at them and that gun was found beside his body, and there was no evidence that resident was

unarmed, that officers did not have reasonable belief that deadly force was necessary, or that gun was "planted" beside resident's body).[8]

Accordingly, we affirm the state court's grant of summary judgment in favor of Vardman on Plaintiffs' claims against him in his individual capacity as he was entitled to qualified immunity.

---

[8] Additionally, while not controlling, federal law interpreting Fourth Amendment excessive force claims are also instructive here. In deciding the merits of such claims, courts must determine whether — given all the facts and circumstances of a particular case — the force used was "objectively reasonable" under the Fourth Amendment. *Graham v. Connor*, 490 U. S. 386, 397 (109 SCt 1865, 104 LE2d 443) (1989). "In determining the reasonableness of the force applied, [courts] look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F3d 1201, 1206 (II) (11th Cir. 2009). See, e. g., *Scott v. Harris*, 550 U. S. 372, 383-384 (III) (B) (2) (127 SCt 1769, 167 LE2d 686) (2007) (officer acted objectively reasonably in striking suspect's car after the suspect engaged in a high-speed chase with multiple police cars, evaded police attempts to block his car, hit a police car, and drove recklessly); *Beshers v. Harrison*, 495 F3d 1260, 1268 (II) (11th Cir. 2007) (affirming grant of summary judgment in 42 USC § 1983 action, holding that officer did not violate suspect's Fourth Amendment rights and was justified in his use of deadly force to seize fleeing suspect in a high-speed chase by causing suspect's vehicle to crash; from officer's perspective, he had reason to believe that suspect, who had ignored the multiple police cars, with blue lights flashing and sirens blaring that had been chasing him for nearly 15 minutes, was a danger to the pursuing officers and others and was driving under the influence of alcohol).

2. Plaintiffs assert that the state court erred by utilizing the wrong legal standard in finding that Chief Boren was not liable for the negligent hiring and retention of Vardman. Plaintiffs allege that the state court improperly conflated the elements of official immunity and the standard for their negligent hiring and retention claim when it found that "there is no evidence that Chief Boren acted with willful, malicious, or specific intent to harm [Giles]."

Pretermitting whether the trial court applied the wrong standard, we affirm the trial court's ruling based on the right for any reason doctrine. See *Cook Pecan Co. v. McDaniel*, 337 Ga. App. 186, 192 (3) (b) (786 SE2d 852) (2016) ("We may affirm the trial court's grant of summary judgment if it is right for any reason, whether stated or unstated, so long as the legal basis was fairly presented in the court below."). Although Plaintiffs alleged in their complaint that Boren failed to properly discipline, restrict, train, or supervise Vardman, they failed to point to any evidence that Boren's hiring or retention of Vardman was done with malice or intent to injure. See *O'Connell v. Cora Bett Thomas Realty*, 254 Ga. App. 311, 313 (1) (563 SE2d 167) (2002) (on summary judgment, once defendant points to lack of evidence of essential element of plaintiff's claim, plaintiff must point to specific evidence of that element). Accordingly, Chief Boren is entitled to qualified immunity with regard to all of

16

Plaintiffs' claims against him in his individual capacity. See *Carter v. Glenn*, 249 Ga. App. 414, 416 (2) (548 SE2d 110) (2001) (holding qualified immunity applied to police chief and mayor sued in their individual capacities for their alleged failure to train and supervise police officer because training and supervising officers are discretionary actions and the plaintiff did not demonstrate malice or intent to cause injury).

3. Finally, Plaintiffs argue that the state court erred in finding that Vardman's use of his police vehicle to"kill" Giles was not a use of a "covered motor vehicle" as outlined in OCGA § 36-92-2 (a),[9] and hence holding that Columbus did not waive its sovereign immunity.

We begin with some context. In Georgia, "sovereign immunity is an immunity from suit, rather than a mere defense to liability," and therefore, whether a

---

[9] To the extent that Plaintiffs challenge the grant of summary judgment on their claims against Vardman in his official capacity, their argument is without merit. As noted by the state court in its order, OCGA § 36-92-3 (a) insulates government employees from liability for motor vehicle collisions when such employees are acting in the performance of their official duties. Pursuant to OCGA § 36-92-3 (b), when bringing suit against a local government officer for a tort involving a covered motor vehicle, the plaintiff "shall name as a party defendant the local government entity for which the officer or employee was acting and shall not name the local government officer or employee individually." As a result, Plaintiffs were not authorized to seek the waiver of Columbus's sovereign immunity pursuant to OCGA § 36-92-2 (a) (3) and also file suit against Vardman in his official capacity.

17

governmental defendant has waived its sovereign immunity is a threshold issue. *Bd. of Regents of Univ. Sys. of Ga. v. Canas*, 295 Ga. App. 505, 507 (1) (672 SE2d 471) (2009), overruled on other grounds by *Rivera*, 298 Ga. at 778. Sovereign immunity extends to counties and can only be waived by a legislative act of the General Assembly specifically providing for the waiver and its extent. *Hewell v. Walton County,* 292 Ga. App. 510, 512 (1) (664 SE2d 875) (2008); see also Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). Accordingly, "[a] waiver of sovereign immunity must be established by the party seeking to benefit from that waiver." *McCobb v. Clayton County*, 309 Ga. App. 217, 218 (1) (a) (710 SE2d 207) (2011) (citation and punctuation omitted). Importantly, "statutes providing for a waiver of sovereign immunity are in derogation of the common law and thus are to be strictly construed *against* a finding of waiver." *Bd. of Regents of Univ. Sys. of Ga. v. One Sixty Over Ninety, LLC*, 351 Ga. App. 133, 138 (1) (830 SE2d 503) (2019) (citation and punctuation omitted; emphasis in original); see also *Smith v. Chatham County*, 264 Ga. App. 566, 568-569 (1) (591 SE2d 388) (2003).

As relevant here, OCGA § 33-24-51 (b) provides a waiver of county sovereign immunity "for a loss arising out of claims for the *negligent use* of a covered motor vehicle," up to the limits of insurance coverage purchased by the county or the

18

minimum monetary limits required by OCGA § 36-92-2 (a). (Emphasis supplied.)

OCGA § 36-92-2 (a) (3) in turn provides that:

> The sovereign immunity of local government entities for a loss arising out of claims for the negligent use of a covered motor vehicle is waived up to . . . $500,000.00 because of bodily injury or death of any one person in any one occurrence, . . . for incidents occurring on or after January 1, 2008.

In determining the scope of the waiver of sovereign immunity covered by OCGA § 36-92-2 (a), we presume that "the General Assembly meant what it said and said what it meant." *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). To that end, we afford the statutory text "its plain and ordinary meaning," and we read that text in the "most natural and reasonable way, as an ordinary speaker of the English language would." Id. at 172-173 (1) (a) (citation and punctuation omitted). See also OCGA § 1-3-1 (b) ("[i]n all interpretations of statutes, the ordinary signification shall be applied to all words").

Bearing these principles in mind, we turn to Plaintiffs' assertion that there is a "causal connection" between Vardman's use of his police cruiser as a vehicle and Giles's death. Our Supreme Court recently clarified that "the 'use' of a motor vehicle

19

as provided in OCGA §§ 33-24-51 (b) and 36-92-2 is not limited by the terms 'actively in use' 'as a vehicle.'"[10] *McBrayer v. Scarbrough*, __ Ga. __, __ (2) (d) (__ SE2d __) (Case No. S22G1152, Oct. 11, 2023) (concluding that "the General Assembly understood that the word 'use' was broad enough to embrace uses of a motor vehicle that extend beyond mere transportation [and] "[i]f the General

---

[10] In so doing, the Court overruled our precedent construing "use" of a motor vehicle in OCGA §§ 33-24-51 (b) and 36-92-2 (a) as being limited to the "active" use of the motor vehicle "as a vehicle." *McBrayer*, __ Ga. at __ (2) (d) & n.11. See, e.g., *Bd. of Commrs. of Putnam County v. Barefoot*, 313 Ga. App. 406, 409 (1) (721 SE2d 612) (2011) ("in construing the meaning of 'use,' we have explained that the question to be answered is whether the injury originated from, had its origin in, grew out of, or flowed from the use of the motor vehicle as a vehicle") (citation, punctuation, and emphasis omitted); *McBrayer v. Scarbrough*, 364 Ga. App. 112, 115 (1) (874 SE2d 146) (2022) (immunity was not waived for a police suspect who died while being held in an inoperative police car that was not being used as anything other than a holding cell at the time of the suspect's death); *Columbus Consolidated Govt. v. Woody*, 342 Ga. App. 233, 238-239 (802 SE2d 717) (2017) (injuries inmate sustained on a prisoner work detail while welding a garbage truck belonging to consolidated city-county did not arise from the negligent "use" of a motor vehicle, and therefore, inmate's negligence claim was barred by sovereign immunity; it was undisputed that at the time of the welding incident, the truck was immobile and undergoing maintenance); *Williams v. Whitfield County*, 289 Ga. App. 301, 302-305 (656 SE2d 584) (2008) (large excavator on the side of the road used to warn motorists of a road closure was not used "as a vehicle" because it was "merely present as a static physical mass"); *Gish v. Thomas*, 302 Ga. App. 854, 861 (2) (691 SE2d 900) (2010) (patrol car was not in use "as a vehicle" for the purposes of waiving sovereign immunity because the car was "essentially being used as a holding cell").

20

Assembly had meant to limit the meaning of 'use' to actively using a motor vehicle as a vehicle, it could have said so, but it did not").

In this case, there is no dispute that Vardman "used" his vehicle to hit Giles, which he claims he did in order to neutralize the threat that Giles posed to Vardman, the other officers, and the public at large. However, this conclusion does not end our inquiry. OCGA § 36-92-2 (a) also requires a showing of "the *negligent* use of a covered motor vehicle," in order to provide for a waiver of county sovereign immunity. (Emphasis supplied.) Neither OCGA §§ 33-24-51 (b) nor 36-92-2 defines the word "negligent," and the word is not defined elsewhere in Chapter 92 of Title 36. See OCGA § 36-92-1 (definitions). "Except when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning." *Catoosa County v. Rome News Media*, 349 Ga. App. 123, 128 (825 SE2d 507) (2019). And the Oxford English Dictionary defines "negligent" as "[i]nattentive to what ought to be done; failing to take proper, necessary, or reasonable care[,]" and "[c]haracterized by or displaying . . . carelessness."[11] Here, the record contains explicit testimony that Vardman made a deliberate decision to use his vehicle to strike

---

[11] The New Shorter Oxford English Dictionary, p. 1899 (1993 ed.).

Giles. Specifically, Vardman admitted he "made the . . . conscious decision to go ahead to stop [Giles] and struck him with [his] patrol [vehicle]" to protect the general public. Importantly, Plaintiffs have failed to cite to any authority, and we are unaware of any, that expands the interpretation of the phrase "negligent use of a covered motor vehicle" to apply to cases such as this one where an officer makes a conscious, explicit, and documented decision to use his patrol vehicle in an intentional manner to neutralize a perceived threat to himself and others. See *Integon Indem. Corp. v. Canal Ins. Co.*, 256 Ga. 692, 693 (353 SE2d 186) (1987) ("Statutes should be read according to the natural and most obvious import of the language, without resorting to subtle and forced constructions, for the purpose of either limiting or extending their operation.").

We find the instant set of facts distinguishable from cases in which an innocent third-party sustains injuries when an officer deliberately uses his vehicle to pursue a fleeing suspect.[12] We also find the present facts distinguishable from cases in which

---

[12] We have explained that "[t]he general rule is that injury to an *innocent third-party* driver arising out of a police car chase is considered a loss 'arising out of the negligent use of a covered motor vehicle' for purposes of OCGA § 33-24-51 (b), where an officer acted with reckless disregard for proper law enforcement procedures in pursuing a fleeing suspect." *Wingler v. White*, 344 Ga. App. 94, 100 (1) (808 SE2d 901) (2017) (citation and punctuation omitted; emphasis supplied), overruled on other grounds by *McBrayer*, __ Ga. at __ (2) (d) & n. 11.

22

a suspect dies or is injured as a result of an officer's attempt to subdue the suspect, but where the officer did not intend for the suspect to die or suffer great bodily harm.[13] See *McBrayer*, __ Ga. at __ (2) (d) ("loading a person into and restraining a person in a patrol car constitutes a 'use' of a patrol car as to which sovereign immunity is waived under OCGA §§ 33-24-51 (b) and 36-92-2"). In those instances, the use of the vehicle, though intentional, is nevertheless "negligent" because the officer did not intend to injure the third-party or the suspect. By contrast in the instant case, as evidenced by his own testimony, Vardman intentionally used his vehicle to neutralize the threat posed by Giles and he was acutely aware that Giles could die or be seriously injured as a result of being rammed by his patrol vehicle. Given that we must strictly construe OCGA § 36-92-2 (a) against a finding of waiver, we agree with the trial court that, under the unique facts of this case, Vardman's intentional use of his patrol car to hit Giles did not amount to the "negligent use of a covered vehicle" as contemplated by OCGA § 36-92-2 (a) so as to give rise to a waiver of sovereign

---

[13] Notably, our Supreme Court has held that OCGA § 40-6-6 (d) (2), which requires a showing of reckless disregard of proper police procedures to recover on claims related to the pursuit of a suspect, "does not govern the claim of the fleeing suspect." *City of Winder v. McDougald*, 276 Ga. 866, 868 (583 SE2d 879) (2003).

immunity.[14] Accordingly, we affirm the trial court's grant of summary judgment in favor of Columbus.[15]

*Judgment affirmed. Doyle, P. J., and Senior Judge C. Andrew Fuller concur.*

---

[14] Our holding is not intended to serve as a blanket rule barring the waiver of sovereign immunity under OCGA § 36-92-2 (a) whenever a law enforcement officer uses a patrol vehicle in the line of duty.

[15] The crux of Plaintiffs' claim under OCGA § 36-92-2 (a) appears to sound in excessive force. As previously discussed in Division 1, a suspect (or next of kin) may be able to recover under state law for his injuries or death if there is a showing that an officer acted with malice or an actual, tortious intent to cause injury. See *Kidd*, 271 Ga. at 33-34. However, based on the totality of the circumstances, Plaintiffs failed to make such a showing with respect to Officer Vardman's actions in this case. Plaintiffs also could have but opted not to raise any federal claims in their renewal action. See *Barrow v. Raffensperger*, 308 Ga. 660, 689 (5) (842 SE2d 884) (2020) (42 USC § 1983 requires a plaintiff to "show that [he] has been deprived of a right secured by the Constitution and laws of the United States, and that the defendant acted under color of state law"); *Howard v. Miller*, 222 Ga. App. 868, 872 (1) (c) (476 SE2d 636) (1996) ("[Georgia has] no equivalent to 42 USC § 1983, which gives a claim against a state officer individually for certain unconstitutional acts.").